On March 15, 2002, Pinkey Burns Austin sued Gayfer Montgomery Fair Co. d/b/a Dillard's ("Dillard's"), her employer, seeking workers' compensation benefits and damages for retaliatory discharge. Dillard's is a Delaware corporation that owns and operates department stores throughout the United States; its principal place of business is in Arkansas. Dillard's filed a motion to dismiss Austin's retaliatory-discharge claim and to compel arbitration of that claim.[1]
In support of this motion, Dillard's filed three affidavits of Diane Ledbetter, operations manager for the Auburn store, where Austin was employed, dated, respectively, April 9, 2002, May 17, 2002, and June 11, 2002; a copy of the "Rules of Arbitration" of Dillard's ("the Rules"); and a copy of Austin's signed "Acknowledgment of Receipt of Rules for Arbitration" ("the Acknowledgment"). Austin filed a response opposing the motion and submitted her own affidavit as evidentiary support for her opposition. Dillard's then filed in the United States District Court for the Middle District of Alabama a petition to compel arbitration. Subsequently, Dillard's filed a motion in the trial court seeking a protective order and requesting a stay of the proceedings in that court pending a ruling by the federal district court on the petition to compel arbitration, which Austin opposed. Dillard's attached to this motion a copy of its petition to the federal district court to compel arbitration and a copy of the "Charge of Discrimination" Austin had filed with the Equal Employment Opportunity Commission ("the EEOC").[2] After a hearing, the trial court entered an order denying the motion for a protective order and for a stay filed by Dillard's and denying the motion to compel arbitration filed by Dillard's. That order stated:
 "A Hearing was held on May 21, 2002 on [Dillard's] Motion to Compel Arbitration, at which both parties submitted briefs to the Court. The Court took [Dillard's] Motion to Compel Arbitration under advisement. Upon considering the parties' Motions, briefs, and arguments, the Court is of the opinion that [Dillard's] Motion for Protective Order and Request for Stay of this Proceeding is due to be Denied. The Alabama Supreme Court stated, `A court should refuse to enforce an arbitration agreement where the record supports a determination of unconscionability.' Ex parte Napier, 723 So.2d 49, 52
(Ala. 1998). The Court finds this Arbitration Agreement unconscionable, as [Austin] was injured at work prior to being required to sign the Arbitration Agreement. Generally, applicable contract defenses, such as fraud, duress or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 of the Federal Arbitration Act. Ex parte Colquitt, 808 So.2d 1018 (Ala. 2001), citing Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 686-87, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). [Dillard's] *Page 685 
should not be allowed to arbitrate the wrongful termination claim since [Austin] had incurred the work injury, which is the subject matter of this suit, prior to being compelled to sign the Arbitration Agreement. Furthermore, the Court finds that the above-styled case is in line with Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759
(Ala. 2000)[, abrogated by Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 123 S.Ct. 2037 (2003)]."[3]
According to Dillard's, the federal district court thereafter "declined jurisdiction over [its] petition because the state court chose to rule on its state court motion."
On August 20, 2002, Dillard's appealed to this Court, presenting the following five issues:
 "I. Whether arbitration agreements between employers and employees are unconscionable per se?
 "II. Whether there was substantial record evidence presented by the plaintiff to support a finding of unconscionability?
 "III. Whether the trial court's holding impermissibly places arbitration agreements on different footing than other contractual terms in violation of United States Supreme Court precedent?
 "IV. Whether the employment of a Sales Associate by a nationwide retailer to sell goods received from other states to customers from Alabama and other states involves interstate commerce?
 "V. Whether the trial court should have stayed this action so that the issues could have been definitely resolved by the United States District Court as to both her state claims and the federal claims she is pursuing under the Americans with Disabilities Act?"
The standard of review for the denial of a motion to compel arbitration is well-settled. As stated in SouthTrust Bank v. Ford, 835 So.2d 990, 993
(Ala. 2002) (quoting American General Finance, Inc. v. Morton,812 So.2d 282, 284 (Ala. 2001)):
 "'This Court reviews the denial of a motion to compel arbitration de novo. Green Tree Fin. Corp. v. Vintson, 753 So.2d 497, 502 (Ala. 1999); Patrick Home Ctr., Inc. v. Karr, 730 So.2d 1171, 1172 (Ala. 1999). The party seeking to compel arbitration has the initial burden of proving the existence of a contract calling for arbitration and proving that the contract evidences a transaction substantially affecting interstate commerce. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala. 1999). . . . "[A]fter a motion to compel arbitration has been made and supported, the burden is on the nonmovant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question." Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (opinion on application for rehearing) (Ala. 1995).'"
 I. Facts
The record reveals that Austin worked as a sales associate for Dillard's at its Auburn store from August 1998 until January 2002. Ledbetter's May 17, 2002, affidavit states, in relevant part:
 "4. Dillard's purchases clothing items and many other products and services from vendors throughout the United States. The merchandise that is sold in the Auburn store is purchased in other *Page 686 
states and is transported to the Auburn store through a warehouse in Valdosta, Georgia. Most, if not all, of the clothing items sold in the Auburn store are purchased by Dillard's buyers in states other than Alabama and are shipped to the Auburn and other Dillard's stores throughout the United States for sale to the public.
 "5. Many of the customers who shop in Dillard's Store Number 273 [the Auburn store] are residents of other states. Auburn is only approximately 30 miles away from the Georgia state line and the store regularly has customers who are Georgia residents. Further, during football game weekends, we have customers in the store who are residents from the states of visiting teams . . . Ms. Austin's work as a Sales Associate affected Dillard's business activities, including its interstate activities and its interstate sales of merchandise. Ms. Austin was paid by Dillard's to wait on customers from states other than Alabama.
 "6. Dillard's regularly purchases and receives goods and services from numerous out-of-state vendors and Ms. Austin regularly used these goods in her job. . . . Dillard's purchases Intimate Apparel products from Jodee (Florida), The Olga Company (Illinois), Donna Karan Intimates (New Jersey), Eileen West (North Carolina), Bali (Tennessee), and Vanity Fair Mills (Texas), as well as Burma, India and Hong Kong. As a sales associate, [Austin] and all other Dillard's Sales Associates are expected to deal with customers and to help Dillard's sell its merchandise to the public. Ms. Austin worked for Dillard's in the Women's Shoe Department, in the Intimate Apparel Department, and she also worked for a period of time answering the telephone for the Auburn store.
 "7. Ms. Austin's work in answering the telephone for the store also involved interstate activities. The store would often receive calls from out of state customers. The store regularly receives calls from Dillard's stores in other states inquiring about particular merchandise; Dillard's corporate personnel in Little Rock, Arkansas; Dillard's division personnel in St. Petersburg, Florida; and Dillard National Bank personnel in Gilbert, Arizona. Ms. Austin was responsible for initially handling each of these telephone calls when she was responsible for answering the telephone for the store.
 "8. Ms. Austin waited and conducted business on Dillard's behalf with customers from states other than Alabama during her employment with Dillard's. A recent example is a Dillard's charge transaction rung on 01/11/02 at 12:56 p.m. — a sale in the amount of $58.05 to a West Point, Georgia customer.
". . . .
 "10. Ms. Austin's paycheck was paid to her with funds from an out-of-state bank — Regions Bank in Little Rock, Arkansas. Further, Ms. Austin's workers compensation insurance was provided through Liberty Mutual of Irving, Texas. Ms. Austin made claims and received benefits from this interstate insurance carrier."
Austin originally worked in the shoe department at Dillard's, but, as stated in her complaint, on April 21, 2000, she "was injured when she struck her right elbow against a steel post while retrieving a pair of shoes from the shoe store room." Austin gave Dillard's notice of her injury that day. Austin's complaint also states, in pertinent part:
 "9. [Her] doctor, Dr. Richard Herrick, M.D., has diagnosed [Austin] with . . . compressive neuropathies, right carpal *Page 687 
tunnel syndrome, epicondylitis, bilateral cubital tunnel syndrome, and myofacial pain/fibromyalgia. Dr. Herrick attributes the cause of these conditions to [her] workplace injury on April 21, 2000.
 "10. Dr. Herrick has imposed permanent workplace restrictions on [Austin] as a result of the April 21, 2000 injury. . . . [She] cannot perform tasks requiring repetitive pinching or grapping [sic], repetitive pushing, pulling or lifting, or tasks that require overhead lifting."
According to Austin, because of the restrictions Dr. Herrick placed on her, Dillard's assigned her to answer the store's telephones from December 2000 until the end of November 2001, "as a form of light duty work." As noted, Ledbetter's May 17, 2002, affidavit stated that while Austin was answering its telephones, she was responsible for handling out-of-state calls from customers, other stores, and the corporate office. In August 2001, Dillard's provided all of its employees with a copy of the Rules, which explained at one point that claims for workers' compensation benefits were not covered by the Rules, "except for claims of retaliation." The Rules also stated, in pertinent part:
 "1. These Rules of Arbitration govern procedures in the arbitration of all covered disputes. [Dillard's] and the Associate agree that the procedures provided in these Rules will be the sole method used to resolve any covered dispute arising between them. These rules do not preclude any associate from filing a charge with a state, local or federal administrative agency such as the [EEOC].
". . . .
 "Arbitration applies to any claims that could be made in a court of law, including the following Covered Disputes:
". . . .
 "Personal injuries except those covered by workers' compensation . . . .
 "Retaliation for filing a protected claim for benefits (such as workers' compensation) or exercising your protected rights under any statute."
(Emphasis supplied.) Ledbetter stated in her April 9, 2002, affidavit, in part:
 "6. . . . In August of 2001, Store Manager Patricia Hippely, Operations Secretary Beverly Marlett and I met with the employees in the Auburn Dillard's on an individual basis to explain [the Rules]. Each employee was provided with his or her own copy of [the Rules]. . . . [Austin] was provided with [a copy the Rules] and with an explanation of how [the Rules] work.
 "7. During our meetings, we explained to the employees that [the Rules] would provide the sole method used to resolve any covered disputes arising between employees and Dillard's.
 "8. At the completion of our meetings, each associate was provided with [a copy of the Acknowledgment] for each employee to sign acknowledging their willingness to be bound by [the Rules]. . . . By signing this document and continuing her employment with Dillard's, Ms. Austin accepted and agreed to the provisions of [the Rules]."
The Acknowledgment Austin signed stated:
 "The arbitration process offers a quick and fair way to resolve disagreements related to employment. This Agreement contains the rules and procedures Dillard's and associates covered under the Agreement must follow to resolve any covered claims through arbitration. This Agreement does not waive anyone's substantive legal rights, nor does this Agreement create or destroy any rights. It merely changes the forum where the dispute is resolved and the procedures *Page 688 
to be followed. Arbitration does not prevent an associate from filing a charge with an administrative agency like the [EEOC].
 "Effective immediately, all employees (as hereinafter defined) of Dillard's, Inc., its affiliates, subsidiaries and Limited Liability Partnerships (the `Company') shall be subject to the RULES OF ARBITRATION (the `Rules') described below. Employees are deemed to have agreed to the provisions of the Rules by virtue of accepting employment with the Company and/or continuing employment therewith.
". . . .
 "I ACKNOWLEDGE RECEIPT OF THE AGREEMENT TO ARBITRATE CERTAIN CLAIMS AND RULES OF ARBITRATION."
(Capitalization in original.)
In her affidavit, Austin stated that Dillard's "withheld the paycheck of any employee that did not voluntarily come into the personnel office to sign the arbitration acknowledgement [sic] form. [Dillard's] withheld my check until I signed the form. . . ." Austin signed the Acknowledgment on August 3, 2001, while still on "light duty work" answering the telephone and thereafter continued working at Dillard's. In her affidavit she contends:
 "It was my understanding that I was merely acknowledging the receipt of [the Rules], when I signed the [Acknowledgment] form. I was not informed that the alleged arbitration agreement would apply to legal claims arising out of my pre-existing injury. In fact, I believed that the alleged arbitration agreement would not apply to any claims related to my pre-existing injury. If I had known that Dillard's would take the position that my signing of the [Acknowledgment] form deprives me of my right to have a jury decide claims related to my injury and my ultimate termination, I would not have signed the [Acknowledgment]."
Austin, in the "Charge of Discrimination" she filed with the EEOC, stated that Ledbetter told her that she could no longer work answering the telephones "because the corporate office objected to paying [her] $9.95 per hour to answer the phones. Initially, I was placed on medical leave for six months. Subsequently, I was involuntarily taken off of medical leave and told by [Ledbetter] to return to work on the sales floor." In December 2001, Dillard's assigned Austin to the intimate apparel department. In the "Charge of Discrimination," Austin also contended that
 "[w]orking in the intimate apparel department required me to do repetitive pinching and grabbing. . . . This work causes me to suffer severe pain in my right arm. . . . My employer has refused to reassign me to another position that does not involve repetitive pinching and grabbing. . . . My employer also refused to place me on medical leave."
In her complaint, Austin asserted that "due to the pain associated with her April 21, 2000, workplace injury and the aggravation of that injury by working in the intimate apparel department, [she] had to repeatedly miss work." Dillard's terminated Austin's employment on January 29, 2002, purportedly because of excessive absenteeism. Austin stated in her complaint that her "termination was in retaliation for her reporting her workplace injury . . . and for insisting that her employer comply with the requirements of the Alabama Workers' Compensation Act."
 II. Unconscionability
In Leonard v. Terminix International Co., 854 So.2d 529 (Ala. 2002), this Court stated that "[t]he applicable standards for determining unconscionability are set forth *Page 689 
in American General Finance[, Inc. v. Branch], 793 So.2d [738] at 748 [(Ala. 2000)] whether there are (1) terms that are grossly favorable to a party that has (2) overwhelming bargaining power."[4] 854 So.2d 538. As noted, the trial court stated that the arbitration agreement evidenced by the Rules and the Acknowledgment was unconscionable because "[Austin] was injured at work prior to being required to sign the Arbitration Agreement." The trial court further stated that "[Dillard's] should not be allowed to arbitrate the wrongful termination claim since [Austin] had incurred the work injury, which is the subject matter of this suit, prior to being compelled to sign the Arbitration Agreement." In her brief to this Court, Austin asserts that "[t]o the extent that the alleged arbitration agreement applies to legal claims arising out of preexisting work related injuries, the agreement is unconscionable and unenforceable under Alabama law"; however, the legal claim at issue, i.e., Austin's retaliatory-discharge claim, does not arise directly from her preexisting work-related injuries. Austin's injuries are not the focus of that claim; she does not contend that she was terminated simply because she was injured. Rather, she asserts in her brief, as she did in her complaint, that she was terminated "for reporting her workplace injury and for insisting that Dillard's comply with the requirements of the Alabama Workers' Compensation Act." At the time Austin signed the Acknowledgment, she did not have either an existing claim or an anticipated or prospective claim for retaliatory discharge because she had not been fired, and she does not suggest that at the time she signed the Acknowledgment, either she or Dillard's was contemplating that her employment might ultimately be terminated. In Austin's response to the motion to dismiss and to compel arbitration filed by Dillard's, she asserted:
 "[T]o the extent that the arbitration agreement applies to legal claims arising out of preexisting injuries, the agreement is unconscionable and unenforceable under Alabama law. See, [Ala. Code 1975,] § 5-19-16 (restating the common law duty of Alabama courts to set aside unconscionable agreements.). There could not be a more unconscionable form of a contract of adhesion than an arbitration agreement forced upon a previously injured worker."
In Green Tree Financial Corp. of Alabama v. Wampler, 749 So.2d 409, 415
(Ala. 1999), this Court stated:
 "Unconscionability is an affirmative defense. The party asserting an affirmative defense has the burden of proof. The party asserting unconscionability as a defense to the enforcement of an arbitration clause has the burden of proof on that issue."
(Citations omitted.)
In Austin's brief to this Court, she argues, in response to the argument by Dillard's that no evidence of unequal bargaining power on the part of Dillard's was presented, the following:
 "Dillard's is incorrect in asserting that there is no evidence that Austin was unable to obtain other employment if she had refused to sign [the Acknowledgment] *Page 690 
and had been fired. The record shows that Austin had suffered a debilitating arm injury and had been assigned to a `light duty' job at the time that Dillard's presented [the Acknowledgment] to her. . . . An injured worker is not able to compete for jobs in the marketplace as uninjured workers; therefore, injured workers are part of a statutorily created protected class of persons who cannot be fired (or threatened with termination) for asserting their statutory rights."
All Austin argued to the trial court and all she argues to this Court is that she could not have found equivalent employment at the time she was forced to sign the Acknowledgment, pursuant to which she agreed to arbitrate her disputes with Dillard's, because she had limited use of her right arm. She has never argued that her preexisting injury or any pain or distress resulting from it in any way compromised or limited her mental ability, her emotional state, or her ability otherwise to read and comprehend the Rules and the Acknowledgment and to knowingly decide whether to enter into the arbitration agreement represented by those documents. In fact, she states in her affidavit that she could perform the light work of answering the telephones "with minimal pain and discomfort." Austin was not singled out as a targeted employee to agree to arbitration. She states in her affidavit that Dillard's "forced all of the employees . . . in Auburn, Alabama to sign the arbitration acknowledgement [sic] form." In Ledbetter's April 9, 2002, affidavit, she attested that all Dillard's employees are asked to sign an Acknowledgment and that she herself signed one.
As noted, Austin asserted in her affidavit:
 "I was not informed that the alleged arbitration agreement would apply to legal claims arising out of my pre-existing injury. In fact, I believed that the alleged arbitration agreement would not apply to any claims related to my pre-existing injury. If I had known that Dillard's would take the position that my signing of the [Acknowledgment] form deprives me of my right to have a jury decide claims related to my injury and my ultimate termination, I would not have signed the [Acknowledgment]."
Austin does not contend that Dillard's misrepresented the meaning of the Rules or the Acknowledgment. Accordingly, what this Court had to say inFirst Family Financial Services, Inc. v. Rogers, 736 So.2d 553, 558
(Ala. 1999), is equally apposite here:
 "[The plaintiffs] argue that the [arbitration agreement] is unconscionable because, they say, they did not understand that they were agreeing to arbitrate disputes arising out of past transactions . . . .
 ". . . The [arbitration agreement] is clear, and in unmistakable terms it obligates the plaintiffs to arbitrate their disputes with [the defendant]. There is no evidence that the plaintiffs could not have understood what they were signing if they had taken the time to read the document. There is also no evidence that the plaintiffs were denied the opportunity to read the document or that they were otherwise tricked into signing it. In fact, the plaintiffs do not even argue that they were incapable of reading and understanding the document or that their signatures were fraudulently induced."
Although Austin argues indirectly that Dillard's possessed overwhelming bargaining power in the transaction in which it obtained her signature on the Acknowledgment, she never addresses the other required component of unconscionability *Page 691 
identified by American General Finance v. Branch, 793 So.2d 738 (Ala. 2000) — whether the terms of the arbitration agreement represented by the Rules and the Acknowledgment are grossly favorable to the party that has the overwhelming bargaining power.
She identifies no terms in the Rules or Acknowledgment grossly favorable to Dillard's, and our own review of those documents discloses none. On the contrary, as Dillard's points out in its brief to this Court, the agreement to arbitrate was equally binding on the parties; it did not limit the types of damages, such as, for example, punitive damages, Austin could recover; and her share of the arbitration fee, $100, was not disproportionate to the amount in controversy and would be reimbursed if the arbitrator found in her favor. The Rules provided Austin with an option to first seek an "internal review" before proceeding to arbitration; gave her a choice in arbitrators;[5] allowed her to be represented at the arbitration by anyone, including an attorney; allowed pre-hearing discovery; and did not restrict her right to sue other parties who might have legal liability. The only thing the Rules do is specify and limit the forum in which Austin may proceed, which necessarily eliminated her right to a trial before a jury. However, as this Court stated in Ex parte McNaughton, 728 So.2d 592,597-98 (Ala. 1998):
 "Instead of suffering unconscionable treatment, a party, `by agreeing to arbitrate, . . . "trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration."' Gilmer [v. Interstate/Johnson Lane Corp.], 500 U.S. [20] at 31, 111 S.Ct. 1647, 114 L.Ed.2d 26 [(1991)] (citations omitted)."
Even if we assume for the sake of analysis that Austin's status as an injured and rehabilitating employee assigned to "light duty" work so reduced her opportunity for alternative employment in the job market as to provide Dillard's with overwhelming bargaining power, nonetheless, because Austin directs our attention to no terms in the Rules that were grossly favorable to Dillard's, we cannot agree that the agreement to arbitrate was unconscionable. We need not resolve the issue of overwhelming bargaining power in this case because it is simply one part of a two-part test that must be satisfied in order to prove unconscionability, and Austin has failed to carry her burden of proving the second part, i.e., that the Rules and/or the Acknowledgment contained "terms that are grossly favorable to a party that has . . . overwhelming bargaining power." American General Finance, 793 So.2d at 748. "Moreover, the Supreme Court has stated: `Mere inequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context.' Gilmer v.Interstate/Johnson Lane Corp., 500 U.S. 20, 33, 111 S.Ct. 1647,114 L.Ed.2d 26 (1991)." Ex parte McNaughton, 728 So.2d at 597. Because Austin did not carry her burden in establishing that the arbitration agreement represented by the Rules and the Acknowledgment was unconscionable, we conclude that the trial court erred in finding that the agreement to arbitrate was unconscionable.
 III. Substantial Effect on Interstate Commerce
We understand the concluding sentence of the trial court's order, "[f]urthermore, *Page 692 
the Court finds that the above-styled case is in line with Sisters of theVisitation v. Cochran Plastering Co.. . .," to represent a finding that the transaction evidenced by the Rules and the Acknowledgment, which Austin was required to sign in order to remain employed, did not substantially affect interstate commerce.[6] However, in Citizens Bankv. Alafabco, Inc., 539 U.S. 52, 56-57, 123 S.Ct. 2037, 2040 (2003), the United States Supreme Court rejected the test set out in Sisters of theVisitation v. Cochran Plastering Co., 775 So.2d 759 (Ala. 2000), and explained:
 "We have interpreted the term `involving commerce' in the [Federal Arbitration Act] as the functional equivalent of the more familiar term `affecting commerce' — words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power. . . .
". . . .
 ". . . Congress' Commerce Clause power `may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent `a general practice . . . subject to federal control.' Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948)."
As explained in Potts v. Baptist Health System, Inc., 853 So.2d 194,198-99 (Ala. 2002) (quoting AmSouth Bank v. Dees, 847 So.2d 923, 929
(Ala. 2002)):
 "'Section 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, provides in pertinent part:
 "'"A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
 "'Section 2 preempts conflicting Alabama law, including in particular Ala. Code 1975, § 8-1-41(3), which states that "[a]n agreement to submit a controversy to arbitration" cannot be specifically enforced.'"
Although the trial court erred in finding that the arbitration agreement was unconscionable, its order can still be upheld if the evidence adduced did not demonstrate that Austin's employment "involved commerce" under Citizens Bank. Dillard's argues that the transaction — Austin's continued employment — did affect interstate commerce, and it presented Ledbetter's affidavits in support of that argument.
Austin contends that her employment at the time she "was forced" to sign the Acknowledgment, involving answering the telephones, did not affect interstate commerce. In her brief to this Court, Austin contends that "[t]his Court must focus upon the narrow question of whether Austin's part-time employment contract to answer telephones for a Dillard's store substantially affects interstate commerce." However, neither Austin nor Dillard's *Page 693 
asserts, nor does the record anywhere indicate, that Austin's job position or job title ever changed from sales associate. Rather, it appears that she was assigned to light-duty work to accommodate her physical limitations. Her job-position designation did not change as far as the record reveals; she remained a sales associate who, in the interim after she was injured, was assigned to light-duty work and then placed on medical leave before being assigned to resume the functions of a sales associate in a new department.
Austin also asserts in her brief to this Court that by signing the Acknowledgment she did not agree to submit any claims to arbitration, but, instead, merely acknowledged her receipt of the Rules. Although the trial judge did not discuss this contention in his order, we may affirm the trial court's order for any reason. Smith v. Equifax Servs., Inc.,537 So.2d 463 (Ala. 1988). As noted, the Acknowledgment stated:
 "Effective immediately, all employees . . . of Dillard's, Inc., its affiliates, subsidiaries and Limited Liability Partnerships (the `Company') shall be subject to the RULES OF ARBITRATION (the `Rules') described below. Employees are deemed to have agreed to the provisions of the Rules by virtue of accepting employment with the Company and/or continuing employment therewith."
(Capitalization in original.) Further, the Rules state that "[Dillard's] and the Associate agree that the procedures provided in these Rules will be the sole method used to resolve any covered dispute arising between them." These facts are analogous to the facts in Baptist Health System,Inc. v. Mack, 860 So.2d 1265 (Ala. 2003). In Mack, we concluded that, by continuing her employment after she received a copy of a dispute-resolution program and by signing an acknowledgment of her receipt of the program, the employee had agreed to the terms of her employer's dispute-resolution program. Accordingly, Austin, by signing the Acknowledgment and subsequently continuing her employment with Dillard's, expressly agreed to be bound by the Rules.
We now consider whether Austin's employment as a sales associate for Dillard's "involved commerce," in accordance with Citizens Bank, supra. Dillard's is a Delaware corporation with its principal place of business in Arkansas. Austin is a resident of Lee County, Alabama. Ledbetter's May 17, 2002, affidavit stated that, because the store is located approximately 30 miles from the Georgia state line, the Auburn store had many customers who were residents of Georgia. Ledbetter also attested that during football-game weekends, the Auburn store had customers who were residents of the states of the visiting teams.
Ledbetter's affidavits establish that Austin, while answering the store's telephones, regularly answered calls from out-of-state customers, from other Dillard's stores located out-of-state, from its corporate office in Arkansas, from its division personnel in Florida, and from Dillard National Bank personnel in Arizona. Ledbetter stated that Austin was responsible for handling these telephone calls.
Attached to Ledbetter's June 11, 2002, affidavit was a list of more than 40 transactions Austin had completed for customers using a credit card issued by Dillard's with an out-of-state billing address, and we can therefore infer that the merchandise sold to those customers likely traveled out-of-state. This list included transactions involving customers with billing addresses in Arizona, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, and Texas. *Page 694 
Ledbetter affirmed in her May 17, 2002, affidavit that "[m]ost, if notall, of the clothing items sold in the Auburn store are purchased by Dillard's buyers in states other than Alabama and are shipped to the Auburn store." (Emphasis supplied.) Further, Ledbetter attested in that affidavit that "[t]he merchandise that is sold in the Auburn store is purchased in other states and is transported to the Auburn store through a warehouse in Valdosta, Georgia." Ledbetter stated that the merchandise in the women's shoe department and the intimate apparel department, to both of which Austin was assigned, was purchased from such states as Florida, Illinois, Massachusetts, Missouri, New Jersey, North Carolina, Oregon, Tennessee, and Texas, and from such countries as Brazil, China, Mexico, Indonesia, Burma, and India.
In its brief in support of its motion to compel arbitration and in its brief to this Court, Dillard's asserts that its "inter-state activities are not divisible from its intra-state activities." Dillard's states:
 "[W]hen [Dillard's] sells an article of clothing, its price includes the expenses incurred to bring the merchandise to the public. Expenses incurred for the employment of Ms. Austin and other sales associates are incorporated into the price of the merchandise in the same manner as other expenses such as shipping costs, vendor expenses, and advertising expenses. Further, Ms. Austin is not paid directly for her transaction with out-of-state customers as compared with the in-state customers."
In light of the aforementioned facts, we conclude that Dillard's has shown that the aggregate effect of Austin's employment did "satisfy the [Federal Arbitration Act's] `involving commerce' test." Citizens Bank,539 U.S. at 57, 123 S.Ct. at 2040. Also, the "general practice" that Austin's employment contract represented, i.e., the sale of consumer goods by a national retailer, involved interstate commerce. CitizensBank, supra; see also Katzenbach v. McClung, 379 U.S. 294, 302 (1964) ("This Court has held time and again that this power [to regulate commerce] extends to activities of retail establishments, . . . which directly or indirectly burden or obstruct interstate commerce."). Further, Ledbetter also attested to the fact that "Austin's paycheck was paid to her with funds from an out-of-state bank — Regions Bank in Little Rock, Arkansas." In certain circumstances, this Court has held that that fact alone can satisfy the requirement of proving that an employment agreement had an effect on interstate commerce. See AmeriquestMortgage Co. v. Bentley, 851 So.2d 458, 465 (Ala. 2002) ("While [the employee] was employed as an account executive at Ameriquest, [the employee] received her monthly salary from Ameriquest's California headquarters. This fact, which is undisputed, sufficiently satisfies Ameriquest and Harmon's burden of proof regarding the employment contract's effect on interstate commerce.").
Accordingly, the trial court's denial of the motion to compel arbitration filed by Dillard's cannot be upheld on the basis that Austin's employment with Dillard's did not affect interstate commerce.
 IV. Motion to Stay
In view of our disposition of the motion to compel arbitration, the arguments Dillard's makes to the effect that the trial court erred by not staying the proceedings until the federal district court action was decided are moot.
 V. Conclusion
The judgment of the trial court denying the motion to compel arbitration filed by Dillard's is reversed and the cause is *Page 695 
remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, SEE, LYONS, BROWN, WOODALL, and STUART, JJ., concur.
MOORE, C.J., and JOHNSTONE, J., dissent.
[1] In its brief to this Court, Dillard's states that it "[does] not seek to compel arbitration of Austin's underlying claim for workers' compensation benefits because that claim [is] expressly excluded under [its] Rules of Arbitration."
[2] Austin asserted in her response to the motion for a protective order and a stay filed by Dillard's that she filed the EEOC complaint "merely to preserve her rights under the Americans with Disabilit[ies] Act . . . prior to the expiration of the 180-day time limit to file an EEOC complaint" and that she has not filed any federal-law claims.
[3] After the trial court entered its order, Dillard's filed a motion to sever Austin's claim for workers' compensation benefits from her retaliatory-discharge claim, which the trial court granted.
[4] In American General Finance v. Branch, 793 So.2d 738 (Ala. 2000), this Court stated that these two essential elements were formulated by consolidating the four components of the test described in Layne v.Garner, 612 So.2d 404, 408 (Ala. 1992): "'(1) whether there was an absence of meaningful choice on one party's part, (2) whether the contractual terms are unreasonably favorable to one party, (3) whether there was unequal bargaining power among the parties, and (4) whether there were oppressive, one-sided or patently unfair terms in the contract.'" 793 So.2d at 748.
[5] The Rules provided that Austin and Dillard's would receive a list of seven neutral arbitrators from which they would agree on an arbitrator, but it also provided that Austin could request a second or third list.
[6] This Court stated in Selma Medical Center, Inc. v. Fontenot,824 So.2d 668, 674 (Ala. 2001):
 "It is well settled that Congress can regulate three broad categories of activity pursuant to its commerce power: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce or persons or things in interstate commerce; and (3) those activities having a substantial effect on interstate commerce."
(Original emphasis omitted; emphasis supplied.)