[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 623 
In this arbitration case we must address the ramifications of the United States Supreme Court's recent decision in CitizensBank v. Alafabco, Inc., 539 U.S. 52, 123 S.Ct. 2037,156 L.Ed.2d 46 (2003). Service Corporation International ("SCI") and SCI Alabama Funeral Services, Inc. ("SCI-Alabama") (hereinafter referred to collectively as "the appellants"), appeal from the denial of the appellants' motion to compel arbitration by the Jefferson Circuit Court. The trial court denied that motion based on our decision in Sisters of the Visitation v. CochranPlastering Co., 775 So.2d 759 (Ala. 2000), which the United States Supreme Court recently abrogated in Citizens Bank. We affirm in part, reverse in part, and remand.
 I. Facts
Following the death of his mother, Blair Fulmer entered into a contract with SCI-Alabama d/b/a Johns-Ridout's Southside Chapel pursuant to which Johns-Ridout's Chapel would, among other things, perform a funeral service and cremate his mother's body. The contract, entitled "Statement of Funeral Goods and Services Selected/Purchase Agreement," included an arbitration provision.
After a funeral service at Johns-Ridout's, Fulmer was presented with a vase; he was told that the vase contained his mother's remains. Fulmer claims that he later discovered that the remains in the vase were not those of his mother. Following this alleged discovery, Fulmer sued SCI-Alabama and SCI (SCI-Alabama's parent company), asserting various claims. The appellants filed a motion to compel arbitration, which the trial court, relying uponSisters of the Visitation, supra, denied, stating that "[t]here is insufficient evidence that this specific contract led to any substantial movement of services or materials across state lines." (Emphasis omitted.) This appeal followed.
 II. Standard of Review "We review de novo a trial court's ruling on a motion to compel arbitration. Green Tree Fin. Corp. v. Vintson, 753 So.2d 497, 502 (Ala. 1999). Initially, the party seeking to compel arbitration must prove 1) the existence of a contract calling for arbitration, and 2) that the contract `is "a contract evidencing a transaction involving commerce" within the meaning of the Federal Arbitration Act (FAA).' Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 53, 123 S.Ct. 2037, 2038, 156 L.Ed.2d 46 (2003) (quoting 9 U.S.C. § 2). `[A]fter a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.' Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala. 1995)."
Hudson v. Outlet Rental Car Sales, Inc., 876 So.2d 455, 457
(Ala. 2003).
 III. Analysis
The appellants argue that the trial court erred in denying their motion to compel arbitration because, they argue, the appellants *Page 624 
met their burden of proving "1) the existence of a contract calling for arbitration, and 2) that the contract `is "a contract evidencing a transaction involving commerce" within the meaning of the Federal Arbitration Act (FAA).'" Hudson, 876 So.2d at 457. While the appellants did produce a contract calling for the arbitration of Fulmer's claims, the trial court held that the contract did not "evidence a transaction involving [interstate] commerce." Additionally, Fulmer argues that even if the interstate-commerce requirement had been met, the trial court did not err in denying the appellants' motion because 1) Fulmer's mental capacity at the time he signed the contract was such that he could not have assented to the arbitration provision, and 2) the arbitration provision is unenforceable because it is unconscionable and the contract containing the provision is a contract of adhesion. Fulmer also contends that even if arbitration is required as to his claims against SCI-Alabama, it is not required as to his claims against SCI, a nonsignatory to the contract.
 A. "Involvement" of Transaction in Interstate Commerce
As stated above, the trial court's ruling was based upon this Court's decision in Sisters of the Visitation. However, as we have previously noted, see, e.g., Wolff Motor Co. v. White,869 So.2d 1129, 1132 (Ala. 2003); Gayfer Montgomery Fair Co. v.Austin, 870 So.2d 683, 692 (Ala. 2003), the interstate-commerce analysis in Sisters of the Visitation was expressly rejected inCitizens Bank. Fulmer acknowledges that Sisters of theVisitation was abrogated in Citizens Bank; however, Fulmer contends that the United States Supreme Court in Citizens Bank
"merely called into question the five-step analysis utilized in the Sisters [of the Visitation] case." Fulmer's brief at 6. Fulmer's characterization of the impact of Citizens Bank is drastically understated. Citizens Bank was a very strong, although not a novel, statement that Congress has the power to bring transactions that are even purely intrastate commercial transactions (i.e., economic transactions) within the reach of its enactments, including the Federal Arbitration Act,9 U.S.C. § 1 et seq. ("the FAA"). To the extent that this point is still unclear, we provide the following clarification.
 1. The Impact of Citizens Bank
As noted in Citizens Bank, our decision in Sisters of theVisitation erred primarily in that it applied the "substantial effect on interstate commerce" test from United States v.Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), to individual transactions to require that each transaction, regardless of its nature, would have to be shown to "substantially affect" interstate commerce before the FAA would be triggered. See Citizens Bank, 539 U.S. at 54-58,123 S.Ct. at 2039-41. In Lopez, the Supreme Court declared that Congress's enactment of the Gun-Free School Zones Act of 1990,18 U.S.C. § 922(q), exceeded Congress's power under the Commerce Clause of the United States Constitution.[1] The Gun-Free School Zones Act made it a federal offense "for any individual knowingly to possess a firearm . . . at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A).
In reaching its holding, the Court described the "three broad categories of activity that Congress may regulate" under the Commerce Clause:
 "First, Congress may regulate the use of the channels of interstate commerce. . . . Second, Congress is empowered to regulate *Page 625 
and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. . . . Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce."
Lopez, 514 U.S. at 558-59, 115 S.Ct. 1624 (emphasis added). Each of these categories relates to the "power of Congress . . . to enact" statutes. Id. at 559, 115 S.Ct. 1624. With respect to the third category (i.e., the "substantially affect" test), theLopez Court
 "specifically identified two types of laws that it had upheld as regulations of activities that substantially affect interstate commerce: (1) `regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce,' Lopez, 514 U.S. at 561, 115 S.Ct. 1624
(majority), and (2) regulations that include a jurisdictional element to ensure, `through case-by-case inquiry,' that each specific application of the regulation involves activity that in fact affects interstate commerce, id."
Brzonkala v. Virginia Polytechnic Inst. State Univ.,169 F.3d 820, 831 (4th Cir. 1999), aff'd, United States v. Morrison,529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). The Lopez
Court held that the Gun-Free School Zones Act was unconstitutional because (1) the Act was a criminal statute that had "nothing to do with `commerce' or any sort of economic enterprise," and (2) the Act "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce."[2] Lopez, 514 U.S. at 561, 115 S.Ct. 1624
(emphasis added).[3]
Furthermore, the Lopez Court held that the "aggregation principle" first announced in Wickard v. Filburn, 317 U.S. 111,63 S.Ct. 82, 87 L.Ed. 122 (1942), could not be used to uphold the Gun-Free School Zones Act. The Court noted that the aggregation principle had not been applied to uphold statutes that did not regulate a commercial or economic transactions:
 "[W]e have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected *Page 626 
interstate commerce. Examples include the regulation of intrastate coal mining[,] intrastate extortionate credit transactions, restaurants utilizing substantial interstate supplies, inns and hotels catering to interstate guests, and production and consumption of homegrown wheat. These examples are by no means exhaustive, but the pattern is clear. Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.
 "Even Wickard [v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)], which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved economic
activity in a way that the possession of a gun in a school zone does not. Roscoe Filburn operated a small farm in Ohio, on which, in the year involved, he raised 23 acres of wheat. It was his practice to sow winter wheat in the fall, and after harvesting it in July to sell a portion of the crop, to feed part of it to poultry and livestock on the farm, to use some in making flour for home consumption, and to keep the remainder for seeding future crops. The Secretary of Agriculture assessed a penalty against him under the Agricultural Adjustment Act of 1938 because he harvested about 12 acres more wheat than his allotment under the Act permitted. The Act was designed to regulate the volume of wheat moving in interstate and foreign commerce in order to avoid surpluses and shortages, and concomitant fluctuation in wheat prices, which had previously obtained. The Court said, in an opinion sustaining the application of the Act to Filburn's activity:
 "`One of the primary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. This may arise because being in marketable condition such wheat overhangs the market and, if induced by rising prices, tends to flow into the market and check price increases. But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. Home-grown wheat in this sense competes with wheat in commerce.'
"317 U.S., at 128, 63 S.Ct., at 90-91.
 "Section 922(q) [the Gun-Free School Zones Act] is a criminal statute that by its terms has nothing to do with `commerce' or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce."
Lopez, 514 U.S. at 559-61, 115 S.Ct. 1624 (emphasis added; citations and footnote omitted). While the Court has "not adopt[ed] a categorical rule against aggregating the effects of any noneconomic activity," the Court's opinion in Lopez
strongly suggests that such a rule should be presumed, because "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." Morrison, 529 U.S. at 613, *Page 627 
120 S.Ct. 1740.[4] See also id. at 611 n. 4,120 S.Ct. 1740 ("[I]n every case where we have sustained federal regulation under the aggregation principle in Wickard v. Filburn,317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the regulated activity was of an apparent commercial character."); id. at 617,120 S.Ct. 1740 ("We . . . reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce."); UnitedStates v. Ballinger, 312 F.3d 1264, 1270 (11th Cir. 2002) ("No aggregation of local effects is permissible to elevate a non-economic activity's insubstantial effect on interstate commerce into a substantial one in order to support federal jurisdiction."). But see United States v. Dascenzo,152 F.3d 1300, 1303 (11th Cir. 1998) (against constitutional challenge, criminal arson statute, 18 U.S.C. § 844(i), upheld using aggregation principle because the target property was used for commercial purposes).
However, the Court in Lopez made it clear that where a statute regulates commercial or economic activity, broadly defined, the statute will be upheld against a constitutional challenge if the "aggregate effect" of such activity — viewed on a nationwide scale — substantially affects interstate commerce.Id. In situations "`where a general regulatory statute bears a substantial relation to commerce,'" it is crucial to note that "`the de minimis character of individual instances arising under that statute is of no consequence.'" Lopez,514 U.S. at 558, 115 S.Ct. 1624 (emphasis omitted; quoting Maryland v.Wirtz, 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020
(1968)); see also Lopez, 514 U.S. at 556, 115 S.Ct. 1624 ("TheWickard Court emphasized that although Filburn's own contribution to the demand for wheat may have been trivial by itself, that was not `enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial.'" (quoting Wickard, 317 U.S. at 127-28, 63 S.Ct. 82)). It is with this point that Sisters of the Visitation primarily conflicts; under Lopez, an individual transaction need not substantially affect interstate commerce to come within the reach of a federal regulatory statute (except, perhaps, when that transaction is a noneconomic transaction).[5] In fact, purely intrastate economic or commercial transactions can be within the reach of Congress if the "`general practice' those transactions represent" has, in the aggregate, a substantial effect on interstate commerce. Citizens Bank, 539 U.S. at 58,123 S.Ct. at 2041.
The Supreme Court has acknowledged that the FAA is a constitutional exercise of Congress's Commerce Clause power. SeeSouthland Corp. v. Keating, 465 U.S. 1, 11, 104 S.Ct. 852,79 L.Ed.2d 1 *Page 628 
(1984) (stating that the FAA "rests on the authority of Congress to enact substantive rules under the Commerce Clause"); PrimaPaint Corp. v. Flood Conklin Mfg. Co., 388 U.S. 395, 405,87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (stating that the FAA "is based upon and confined to the incontestable federal foundations of `control over interstate commerce and over admiralty'"). The FAA contains a "jurisdictional element which would ensure, through case-by-case inquiry," Lopez, 514 U.S. at 561,115 S.Ct. 1624, that whatever transaction is at issue affects interstate commerce:
 "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce[6] to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
9 U.S.C. § 2 (emphasis added).[7] As stated above, economic or commercial transactions (such as, for example, the buying and selling of goods or services, contracting for employment, etc.), even one that is purely intrastate, is within the reach of the FAA if the "`general practice' those transactions represent" has, in the aggregate, a substantial effect on interstate commerce.Citizens Bank, 539 U.S. at 58, 123 S.Ct. at 2041.
The impact of Citizens Bank is, therefore, to reorient our understanding of what manner of interstate commerce "involvement" is required to bring a contract within the reach of the FAA. In a very real sense, an argument that a transaction does not "involve" commerce under the FAA is actually an argument that Congress does not have the constitutional power under the Commerce Clause to reach and regulate that type of transaction. As the decisions of the United States Supreme Court have made clear, there are few, if any, economic or commercial transactions that are beyond the reach of Congress's commerce power. Furthermore, virtually every kind of industry, small or large, is currently regulated by some sort of federal statute enacted pursuant to Congress's commerce power. See, e.g., 29 U.S.C. §§ 201-19 (Fair Labor Standards Act of 1938); 29 U.S.C. §§ 651-78 (Occupational Safety and Health Act of 1970);29 U.S.C. §§ 2601-2654 (Family Medical Leave Act of 2000); 42 U.S.C. §§ 2000e
to 2000e-17 (Title VII of the Civil Rights Act of 1964, as amended). *Page 629 
We recognize that the mere fact that Congress does claim regulatory power over a particular industry or type of transaction does not mean that Congress in fact has the authority to do so under the Commerce Clause. The Supreme Court has stated as much:
 "[T]he existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. As we stated in Lopez, `"[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.'" Rather, `"[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court."'"
Morrison, 529 U.S. at 614, 120 S.Ct. 1740. However, we also note that, since the establishment of what could be considered the "modern" (post-1936) interpretation of Congress's power under the Commerce Clause, the Supreme Court has not declared unconstitutional a single federal statute that regulated economic or commercial activity.[8]
Given this background, and in light of the continued vitality of Wickard (which represents the outer limits of Congress's commerce power, see Lopez, 514 U.S. at 560, 115 S.Ct. 1624), it would be difficult indeed to give an example of an economic or commercial activity that one could, with any confidence, declare beyond the reach of Congress's power under the Commerce Clause, and, by extension, under the FAA. While there can be noper se rule that would preclude a trial court's role in evaluating whether a contract "evidenc[es] a transaction involving commerce,"[9] see Morrison, 529 U.S. at 614,120 S.Ct. 1740, given the above, a trial court evaluating a contract connected to some economic or commercial activity would rarely, if ever, refuse to compel arbitration on the ground that the transactions lacked "involvement" in interstate commerce.
 2. Application to this Case
In light of the above analysis, the resolution of the first issue in this case becomes relatively simple. The appellants contend that the "general practice" of providing funeral services is well within the reach of Congress's commerce power. We agree. The transaction underlying the contract between Fulmer and SCI-Alabama (for the sale of goods and services), is unquestionably economic in nature, and *Page 630 
the nationwide aggregate effect of such a transaction on interstate commerce easily brings the practice of contracting to provide funeral services and associated goods within the reach of Congress through the FAA. See Gayfer Montgomery Fair Co., 870 So.2d at 694 (holding that "the `general practice' that Austin's employment contract represented, i.e., the sale of goods by a national retailer, involved interstate commerce"); Wolff MotorCo., 869 So.2d at 1134 (holding that "[t]he automobile business in the aggregate involves interstate commerce"). This is true even though the effect of this particular transaction (Fulmer's contract with SCI-Alabama) on interstate commerce may be considered trivial. See Wickard, 317 U.S. at 127-28,63 S.Ct. 82.
Additionally, affidavits filed in support of the appellants' motion to compel arbitration assert that the funeral services provided by SCI-Alabama are regulated by the Federal Trade Commission ("the FTC"), see 16 C.F.R. § 453,[10] and by the Occupational Safety and Health Administration ("OSHA"). Both of these entities base their regulatory power over entities like SCI-Alabama on Congress's commerce power. See 16 C.F.R. § 53;29 U.S.C. § 651(b) ("The Congress declares it to be its purpose and policy, through the exercise of its powers to regulate commerce
among the several States and with foreign nations and to provide for the general welfare, to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." (emphasis added)). Fulmer does not contest the appellants' assertions that the funeral services provided by SCI-Alabama are regulated by the FTC and OSHA, nor does Fulmer contend that such federal regulation exceeds Congress's constitutional authority.
Based on the above, we hold that the contract between Fulmer and SCI-Alabama "evidenc[es] a transaction involving commerce."9 U.S.C. § 2.
 B. Fulmer's Other Arguments
As stated above, the trial court's denial of the appellants' motion to compel arbitration relied solely on our decision inSisters of the Visitation. However, Fulmer asserts three other bases upon which we might affirm the trial court's denial of the appellants' motion to compel arbitration:[11] Fulmer's claims 1) that he lacked the necessary mental capacity when he entered into the contract with SCI-Alabama, 2) that the arbitration provision is unconscionable, and 3) that he should not be compelled to arbitrate his claims against SCI because SCI was not a party to the contract.
Fulmer contends that he did not consent to arbitration because, when he entered into the contract with SCI-Alabama, he was suffering great emotional distress over the loss of his mother. He also contends that the arbitration provision is unconscionable primarily because the contract in which the provision appears is a contract of adhesion. These contentions do not support an affirmance of the order of the trial court for several reasons.
First, Fulmer's breach-of-contract claim (and perhaps some of his other claims) is based upon Fulmer's own assertion that a valid contract exists between *Page 631 
him and SCI-Alabama. It was only after the appellants filed their motion to compel arbitration that Fulmer asserted, in his response, that the contract was unconscionable and that he did not have the requisite mental capacity when he entered into it. Courts will not permit this type of inconsistent pleading — an obvious attempt to avoid arbitration while seeking the benefits of the contract. See, e.g., Credit Sales, Inc. v. Crimm,815 So.2d 540, 546 (Ala. 2001) (stating that a plaintiff "cannot pick and choose" between those contract provisions that benefit the plaintiff and those to which the plaintiff wishes not to be bound; "instead, [the plaintiff] must accept or reject the entire contract"); see also Leonard v. Terminix Int'l Co.,854 So.2d 529, 533 (plaintiffs who alleged unconscionability as a ground for avoiding arbitration sought rescission of their contracts with Terminix).
Second, Fulmer's alleged lack of mental capacity, even if true, is a defense directed toward the contract as a whole, not just toward the arbitration provision. The resolution of such a defense is for an arbitrator, not a trial court, to decide. It is well settled that, with an exception not relevant here,[12]
"a challenge that concerns `"the making of [a] contract in its entirety, rather than just . . . the arbitration agreement itself"' is for an arbitrator, rather than a court, to resolve."Mason v. Acceptance Loan Co., Inc., 850 So.2d 289, 294-95 (Ala. 2002)[13] (quoting NationsBanc Invests., Inc. v.Paramore, 736 So.2d 589, 591 (Ala. 1999) (quoting in turnAnniston Lincoln Mercury Dodge v. Conner, 720 So.2d 898, 902
(Ala. 1998))). See also Green Tree Fin. Corp. of Alabama v.Wampler, 749 So.2d 409, 414 (Ala. 1999) (holding that a charge of unconscionability was directed to the contract as a whole where the plaintiffs claimed "that they were forced to sign [the contract] because of `tremendous economic duress' arising from a combination of sales pressure concerning the impending deadline on the availability of a no-money-down payment plan and what they describe as their limited financial condition"). Our conclusion is demanded notwithstanding Fulmer's attempt to frame the issue as though he had the mental capacity to understand everythingbut the arbitration provision. See Wampler, 749 So.2d at 414 ("Artful pleading cannot defeat the operation of this rule. . . . `"[W]e must look beyond the ad hoc arguments of counsel in order to determine whether [the plaintiff's] claim actually bears upon the entire agreement" or just the arbitration clause.'" (quoting NationsBanc Investments, Inc., 736 So.2d at 591 (quoting in turn Anniston Lincoln Mercury Dodge, 720 So.2d at 901-02))).
Finally, Fulmer's claim that the arbitration provision is unconscionable would be without merit, even had it been properly asserted. It is difficult to describe precisely what Fulmer's exact argument is with regard to his unconscionability claim. Fulmer relies on our decision in Leonard v. TerminixInternational Co., 854 So.2d 529 (Ala. 2002), as support for his argument *Page 632 
that the arbitration provision is "procedurally unconscionable." However, the substance of Fulmer's argument appears to be that his contract with SCI-Alabama is one of adhesion, and because he signed the contract during a very stressful period in his life, the contract is unconscionable.
Fulmer misconstrues our holding in Leonard. While the arbitration provision in Leonard was part of a contract of adhesion, it also included a "limitation upon recovery of `indirect, special, and consequential damages or loss of anticipated profits,'" and prohibited treatment of the plaintiff's claims as a class action. 854 So.2d at 538. We held that, under those circumstances, the arbitration provision was unconscionable because the terms were "unreasonably favorable [toward the defendant] and patently unfair [toward the plaintiffs,]" and therefore met the two-part unconscionability test set forth in American General Finance, Inc. v. Branch,793 So.2d 738, 748 (Ala. 2000).[14] 854 So.2d at 538; see alsoLeonard, 854 So.2d at 539 ("This arbitration agreement is unconscionable because it is a contract of adhesion that restricts the Leonards to a forum where the expense of pursuing their claim far exceeds the amount in controversy.").
The arbitration provision at issue in this case contains none of the problematic components discussed in Leonard. The provision in Fulmer's contract with SCI-Alabama provides:
 "ANY CONTROVERSY OR CLAIM ARISING BETWEEN THE PARTIES (INCLUDING THE INTERPRETATION OF THIS ARBITRATION CLAUSE) SHALL BE SUBMITTED TO AND FINALLY RESOLVED BY MANDATORY AND BINDING ARBITRATION IN ACCORDANCE WITH THE STATUTES, RULES OR REGULATIONS GOVERNING ARBITRATIONS IN THE STATE WHERE THIS AGREEMENT HAS BEEN EXECUTED. IN THE ABSENCE OF SUCH STATUTES, RULES OR REGULATIONS, THE ARBITRATION PROCEEDINGS SHALL BE CONDUCTED IN ACCORDANCE WITH THE APPLICABLE RULES OF THE AMERICAN ARBITRATION ASSOCIATION (`AAA'); PROVIDED HOWEVER, THAT THE FOREGOING REFERENCE TO THE AAA RULES SHALL NOT BE DEEMED TO REQUIRE ANY FILING WITH THAT ORGANIZATION, NOR ANY DIRECT INVOLVEMENT OF THAT ORGANIZATION. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN APPLICABLE STATUTES, RULES OR REGULATIONS, THE ARBITRATOR SHALL BE SELECTED BY MUTUAL AGREEMENT OF THE PARTIES OR BY A COURT OF COMPETENT JURISDICTION IN THE CITY OR COUNTY IN WHICH SELLER IS LOCATED, UPON THE APPLICATION OF ONE OR BOTH PARTIES. THIS ARBITRATION PROVISION SHALL BE BINDING ON THE SELLER, YOU AS THE PURCHASER, AND ANY OTHER PERSON WHO CLAIMS TO BE A THIRD PARTY BENEFICIARY OF THIS AGREEMENT."
(Capitalization in original.) Even assuming the contract between Fulmer and SCI-Alabama was a contract of adhesion, Fulmer's *Page 633 
claim that his mental distress at the time he signed it made the arbitration provision unconscionable is unpersuasive. Sellers of goods and services do not have a general duty to test or ensure the mental capabilities of their customers; if the terms of the provision are not "unreasonably favorable and patently unfair," the provision is not unconscionable. Fulmer bears the burden of proving that the terms of the arbitration provision are unconscionable, and he has not met that burden. Providian Nat'lBank v. Screws, [Ms. 1020668, Oct. 3, 2003] ___ So.2d ___, ___ (Ala. 2003) ("Under Alabama law, arbitration provisions are not per se unconscionable. Rather, the party asserting the affirmative defense of unconscionability bears the burden of proving that the provision is unconscionable." (citation omitted)).[15]
 C. Can SCI Enforce the Arbitration Provision?
Fulmer's final argument is directed solely at SCI, who is a nonsignatory to the contract and who, Fulmer claims, therefore cannot enforce the arbitration provision. Fulmer claims that the arbitration provision references only the signing parties — Fulmer and SCI-Alabama — and, therefore, it cannot encompass a nonsignatory defendant like SCI. SCI argues that the provision is not strictly limited to the signing parties, and, more importantly, *Page 634 
that Fulmer's claims against the signatory defendant, SCI-Alabama, are so "intertwined" with his claims against SCI that arbitration of all of Fulmer's claims, including those against SCI, is appropriate.
In Ex parte Stamey, 776 So.2d 85, 89 (Ala. 2000), we discussed the doctrine of equitable estoppel with regard to nonsignatories to arbitration agreements:
 "In order for a party to be equitably estopped from asserting that an arbitration agreement cannot be enforced by a nonparty, the arbitration provision itself must indicate that the party resisting arbitration has assented to the submission of claims against nonparties — claims that would otherwise fall within the scope of the arbitration provision — to arbitration. See Ex parte Napier, 723 So.2d [49] at 53 [(Ala. 1998)]. All that is required is (1) that the scope of the arbitration agreement signed by the party resisting arbitration be broad enough to encompass those claims made by that party against nonsignatories, or that those claims be `intimately founded in and intertwined with' the claims made by the party resisting arbitration against an entity that is a party to the contract, and (2) that the description of the parties subject to the arbitration agreement not be so restrictive as to preclude arbitration by the party seeking it. See Id. In other words, the language of the arbitration agreement must be so broad that the nonparty could assert that in reliance on that language he believed he had the right to have the claims against him submitted to arbitration, and, therefore, that he saw no need to enter into a second arbitration agreement."
Here, Fulmer's claims against SCI are clearly "intimately founded in and intertwined with" his claims against SCI-Alabama. Id.
All of Fulmer's claims arise from the same set of facts. Virtually none of Fulmer's claims makes a distinction between the alleged bad acts of SCI (the parent corporation) and those of SCI-Alabama (its subsidiary);[16] rather, the claims are asserted as if SCI and SCI-Alabama acted in concert. Because Fulmer's claims are sufficiently "intertwined," the only remaining question is whether the arbitration provision is "so restrictive as to preclude arbitration by" SCI. Id.
In Stamey, we discussed two lines of cases that have evolved with regard to the issue of "restrictiveness":
 "In most of the cases that have come before this Court on an equitable-estoppel claim, we have not allowed the claims to be arbitrated, because the language of the arbitration provisions limited arbitration to the signing parties, so that there had been no assent on the part of the resisting party to arbitrate claims against nonsignatories. See First Family Fin. Servs., Inc. v. Rogers, 736 So.2d 553
(Ala. 1999); Med Center Cars, Inc. v. Smith, 727 So.2d 9 (Ala. 1998); Ex parte Isbell, 708 So.2d 571
(Ala. 1997); Ex parte Martin, 703 So.2d 883 (Ala. 1996); Ex parte Jones, 686 So.2d 1166 (Ala. 1996); Ex parte Stallings Sons, Inc., 670 So.2d 861
(Ala. 1995); see also David F. Sawrie, Equitable Estoppel and the Outer Boundaries of Federal Arbitration Law: The Alabama Supreme Court's Retrenchment of an Expansive Federal Policy Favoring Arbitration, 51 Vand. L.Rev. 721 (1998). In other words, within these arbitration provisions references to the parties specifically limited the claims that would be arbitrable under those provisions. For *Page 635 
example, the arbitration agreement at issue in Med Center Cars read:
 "`BUYER HEREBY ACKNOWLEDGES AND AGREES THAT ALL DISPUTES AND CONTROVERSIES OF EVERY KIND AND NATURE BETWEEN BUYER AND SELLER ARISING OUT OF OR IN CONNECTION WITH THE PURCHASE OF THIS VEHICLE WILL BE RESOLVED BY ARBITRATION WITH THE PROCEDURE SET FORTH ON THE REVERSE SIDE OF THIS BUYER'S ORDER.'
 "Med Center Cars, 727 So.2d at 13. (Emphasis added.) This Court wrote:
 "`The language of the arbitration clauses in this case [is] not broad enough to encompass claims against the nonsignatories. The written arbitration agreements in this case expressly limit the scope of the agreements to "disputes, claims, and controversies" arising between the "Buyer" and the "Seller" only. . . . Therefore, the nonsignatories have no standing to seek enforcement of those arbitration agreements.'
 "Id. at 19. Because the agreement in Med Center Cars limited the claims that might be submitted to arbitration to those between the `buyer' and the `seller,' the buyer, who was resisting arbitration, could not be found to have assented to have his claims against a nonparty lender submitted to arbitration. Med Center Cars applied the rule that if the arbitration provision is specifically limited to claims that arise between the parties to the contract, then any nonparties will not be able to enforce the arbitration agreement.
 "However, this Court has also held that the language of other arbitration agreements was sufficiently broad to include claims against nonparties, and in regard to such agreements it has allowed nonparties to enforce the arbitration provisions against parties to the contract. See Ex parte Napier, 723 So.2d 49
(Ala. 1998); Ex parte Gates, 675 So.2d 371 [(Ala. 1996)]; see also Sawrie, Equitable Estoppel and the Outer Boundaries of Federal Arbitration Law: The Alabama Supreme Court's Retrenchment of an Expansive Federal Policy Favoring Arbitration, 51 Vand. L.Rev. 721. For example, the arbitration provision in Napier read:
 "`21. ARBITRATION: All disputes, claims or controversies arising from or relating to this Contract or the relationships which result from this Contract, or the validity of this arbitration clause or the entire Contract, shall be resolved by binding arbitration by one arbitrator selected by Assignee with consent of Buyer(s). This arbitration Contract is made pursuant to a transaction in interstate commerce, and shall be governed by the Federal Arbitration Act at 9 U.S.C. Section 1. Judgment upon the award rendered may be entered in any court having jurisdiction. The parties agree and understand that they choose arbitration instead of litigation to resolve disputes. The parties understand that they have a right or opportunity to litigate disputes through a court, but that they prefer to resolve their disputes through arbitration except as provided herein. THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL EITHER PURSUANT TO ARBITRATION UNDER THIS CLAUSE OR PURSUANT TO A COURT ACTION BY ASSIGNEE (AS PROVIDED HEREIN). The parties agree and understand that all disputes arising under case law, statutory *Page 636 
law and all other laws including, but not limited to, all contract, tort and property disputes will be subject to binding arbitration in accord with this contract. The parties agree and understand that the arbitrator shall have all powers provided by the law and the Contract. These powers shall include all legal and equitable remedies including, but not limited to, money damages, declaratory relief and injunctive relief. Notwithstanding anything hereunto [sic] the contrary, Assignee retains an option to use judicial or non-judicial relief to enforce a security agreement relating to the Manufactured Home secured in a transaction underlying this arbitration agreement, to enforce the monetary obligation secured by the Manufactured Home or to foreclose on the Manufactured Home. Such judicial relief would take the form of a lawsuit. The institution and maintenance of an action for judicial relief in a court to foreclose upon any collateral, to obtain a monetary judgment or to enforce the security agreement shall not constitute a waiver of the right of any party to compel arbitration regarding any other dispute or remedy subject to arbitration in this Contract, including the filing of a counterclaim in a suit brought by Assignee pursuant to this provision.'
 "Napier, 723 So.2d at 51. (Emphasis added.) That arbitration provision in Napier contained no references to the parties that would impose a limitation on what claims would be arbitrated. We held that the provision was broad enough to include claims that were related to the contract because the language was sufficient to indicate that the party resisting arbitration had assented to submit its claims against nonparties — claims that otherwise would fall within the scope of the provision — to arbitration. Id. at 54.
 "Is the arbitration provision included in the Green Tree contract broad enough to indicate that the Stameys assented to have their claims against Hallmont — claims that would otherwise fall within the arbitration agreement — submitted to arbitration? In other words, is the arbitration provision involved in this action more similar to the arbitration provisions in the First Family line of cases or those in the Napier line of cases?"
Stamey, 776 So.2d at 89-91 (capitalization original); see alsoEquifirst Corp. v. Ware, 808 So.2d 1, 5 (Ala. 2001); SunkistSoft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753 (11th Cir. 1993) (allowing nonsignatory parent company to enforce arbitration provision based on "intertwined" claims where provision required arbitration of "any controversy or claimarising out of or relating to this Agreement or the breachthereof. . . .").
The question at the end of the language quoted above fromStamey — "[I]s the arbitration provision . . . more similar to the arbitration provisions in the First Family line of cases or those in the Napier line of cases?" — is the question we must resolve in this case. Is the arbitration provision in Fulmer's contract with SCI-Alabama "more similar to the arbitration provisions in the First Family line of cases or those in theNapier line of cases?" Stamey, 776 So.2d at 91. The arbitration provision at issue here states:
 "ANY CONTROVERSY OR CLAIM ARISING BETWEEN THE PARTIES (INCLUDING THE INTERPRETATION OF THIS ARBITRATION CLAUSE) SHALL BE SUBMITTED TO AND FINALLY RESOLVED BY MANDATORY AND BINDING ARBITRATION. . . . THIS ARBITRATION *Page 637 
PROVISION SHALL BE BINDING ON THE SELLER, YOU AS THE PURCHASER, AND ANY OTHER PERSON WHO CLAIMS TO BE A THIRD PARTY BENEFICIARY OF THIS AGREEMENT."
(Capitalization original; emphasis added.)[17] We hold that the arbitration provision in this case is more similar to the line of cases following First Family Financial Services, Inc. v.Rogers, 736 So.2d 553 (Ala. 1999), because the provision covers only claims that arise "between the parties," the only exception being that the provision also covers those who claim status as a third-party beneficiary. SCI is not a party to the contract; neither does it claim to be a third-party beneficiary. Therefore, Fulmer is not equitably estopped from asserting that SCI cannot enforce the arbitration provision. The trial court did not err in denying the motion to compel arbitration as to Fulmer's claims against SCI.
 IV. Conclusion
Based on the above, we affirm the trial court's order insofar as it denied the appellants' motion to compel arbitration of Fulmer's claims against SCI, and we reverse the order insofar as it denied the motion to compel arbitration of Fulmer's claims against SCI-Alabama. We remand the case to the trial court for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
SEE, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
LYONS and JOHNSTONE, JJ., concur in the rationale in part and concur in the judgment.
[1] U.S. Const. Art. I, § 8, cl. 3 (providing that Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes").
[2] The Lopez Court was careful to use the terms "substantially affects interstate commerce" when referring to the nationwide, aggregate effect of the statute and simply "affects interstate commerce" when referring to any individual possession of a firearm. Lopez, 514 U.S. at 561, 115 S.Ct. 1624. The Court had held four months earlier in Allied-Bruce Terminix Cos. v.Dobson, 513 U.S. 265, 273, 115 S.Ct. 834, 130 L.Ed.2d 753
(1995), that the use of the term "affects interstate commerce" indicated "Congress' intent to exercise its Commerce Clause powers to the full" and should be read with the broadest possible interpretation. Of course, in Allied-Bruce the Court stated that individual contracts had only to "affect" interstate commerce; the Court was not resolving a constitutional challenge to the FAA that would have raised the question whether the FAA's nationwide effect was a "substantial effect" on interstate commerce.
[3] Following Lopez, Congress amended the Gun-Free School Zones Act, adding a "jurisdictional element." Under the amended statute, which has since been upheld as a proper exercise of Congress's commerce power, see, e.g., United States v. Danks,221 F.3d 1037, 1038-39 (8th Cir. 1999), it is "unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A).
[4] The Supreme Court has not yet established a test to determine whether an individual noneconomic activity (which, apparently, cannot be viewed in light of its nationwide aggregate effect) "affects" interstate commerce. See Brannon P. Denning 
Glenn H. Reynolds, Rulings and Resistance, The New CommerceClause Jurisprudence Encounters the Lower Courts, 55 Ark. L.Rev. 1253, 1311 n. 245 (2003), and accompanying text (noting the existence of this and other still-open questions regarding the interpretation of Congress' power under the Commerce Clause); see also United States v. Ballinger, 312 F.3d 1264, 1280 n. 1 (11th Cir. 2002) (Hall, J., dissenting) (discussing some difficulties in the Court's Commerce Clause jurisprudence that remain afterLopez and Morrison).
[5] See Ballinger, 312 F.3d at 1270 ("Where . . . regulation [of noneconomic activity] is at issue, the Constitution requires that the activity, by itself, have economic consequences thatsubstantially affect interstate commerce.").
[6] The phrase "involving commerce" carries the same meaning as the phrase "affecting commerce," and "signals an intent to exercise Congress' commerce power to the full." Allied-BruceTerminix Co. v. Dobson, 513 U.S. 265, 277, 115 S.Ct. 834,130 L.Ed.2d 753 (1995).
[7] As is made clear from the above discussion, not every federal statute need contain a "jurisdictional element" to be a proper exercise of Congress's power under the Commerce Clause. See United States v. Cunningham, 161 F.3d 1343, 1345 (11th Cir. 1998) (stating that "we have `rejected the argument that Lopezrequires Congress to place a jurisdictional element in every statute enacted pursuant to the Commerce Clause'" (quotingUnited States v. Wright, 117 F.3d 1265, 1269 (11th Cir. 1997))). It is not surprising, however, that the FAA contains such a jurisdictional element. Unlike federal statutes in which it is patently clear that the regulated activity is economic in nature, the FAA relates to contracts containing arbitration clauses, and those contracts could be of an economic or a noneconomic nature.
[8] While there is no doubt that the post 1936 expansion of Congress's power under the Commerce Clause has been a controversial issue, see, e.g., Selma Medical Center, Inc. v.Fontenot, 824 So.2d 668, 681-87 (Ala. 2001) (Moore, C.J., dissenting); Omar N. White, The Endangered Species Act'sPrecarious Perch: A Constitutional Analysis Under the CommerceClause and the Treaty Power, 27 Ecology L.Q. 215, 235 (2000) ("Prior to 1936, there were significant limitations upon the power of the federal government to regulate commerce, but . . . the Court has [since] almost completely deferred to Congress in such matters."); Steven G. Calabresi, "A Government of Limitedand Enumerated Powers": In Defense of United States v. Lopez, 94 Mich. L.Rev. 752, 752 (1995) (describing the Supreme Court, with regard to its post 1936 Commerce Clause jurisprudence, as being "asleep at the constitutional switch" for more than 50 years); Richard A. Epstein, The Proper Scope of the Commerce Power, 73 Va. L.Rev. 1387, 1400 (1987) ("The New Deal was not a reformation, but a sharp departure from previous case law. . . ."), Alabama courts have no discretion to depart from the interpretations of the Commerce Clause set forth by the United States Supreme Court. See U.S. Const. Art. VI.
[9] 9 U.S.C. § 2.
[10] The Federal Trade Commission administers the Federal Trade Commission Act, 15 U.S.C. §§ 41-58, among many other federal statutes. See 16 C.F.R. § 0.4.
[11] See Smith v. Equifax Servs., Inc., 537 So.2d 463, 465
(Ala. 1988) (stating that an appellate court can affirm a judgment of a trial court for any reason, even one not raised in the trial court).
[12] "[A] challenge to the very existence of the contract — as is the case when contracts are challenged as being `void' as opposed to `voidable' [or when fraud in the factum is alleged] — is an issue for a court, not an arbitrator, to decide." Mason v.Acceptance Loan Co., Inc., 850 So.2d 289, 295 (Ala. 2002).
[13] In Mason, we held that a plaintiff's claim of insanity under Ala. Code 1975, § 8-1-170, as a defense to a contract was an issue for the court, and not an arbitrator, to decide. 850 So.2d at 295 (stating that "contracts of insane persons are wholly and completely void" (quoting Shoals Ford, Inc. v. Clardy,588 So.2d 879, 881 (Ala. 1991))). Fulmer asserts no claim of insanity in this case.
[14] In Branch, 793 So.2d at 748, we summarized the four-part test found in Layne v. Garner, 612 So.2d 404 (Ala. 1992), as follows: a contract can be held to be unconscionable when it contains "(1) terms that are grossly favorable to a party that has (2) overwhelming bargaining power." In Leonard, we noted that "[o]ne of the criteria for finding a contract unconscionable is that it be `patently unfair.'" 854 So.2d at 538.
[15] One of Fulmer's contentions is that he received no quid pro quo for agreeing to arbitrate his claims against SCI. He bases this assertion on a statement found in Leonard that, in that case, the Leonard plaintiffs were not "given any quid proquo for agreeing to arbitration and forgoing their constitutional right to a trial by jury." 854 So.2d at 538. Without deciding whether this statement, in the context ofLeonard, was erroneous, we note that any attempt to turn that statement into a generally applicable principle would clearly be erroneous.
Arbitration provisions are to be treated like any other contractual provision. Doctor's Assocs., Inc. v. Casarotto,517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (noting that in enacting the FAA, "Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed `upon the same footing as other contracts.'" (quoting Scherk v. Alberto-Culver Co.,417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974))). Generally, when a party agrees to an arbitration provision (or any other contractual provision), he is deemed to have made a cost/benefit decision to do so, even if he would have wished for more favorable terms (of course, there is no constitutional right to "favorable terms," regardless of a party's economic situation). A party may freely choose to give up his constitutional right to a jury trial even when doing so is required to receive some good or service, and when he has done so he has weighed the costs of not having the good or service and has found those costs to outweigh the value to him, at that time, of the perceived benefit of a future jury trial in the occurrence of a future dispute. In such a situation, he has also factored in and found favorable the benefits of arbitration. We discussed some of these considerations in Ex parte McNaughton, 728 So.2d 592, 597-98
(Ala. 1998):
 "When interpreting the FAA, the federal courts have concluded that, consistent with the federal policy strongly favoring arbitration, Moses H. Cone Mem'l Hospital [v. Mercury Constr. Corp.], 460 U.S. [1,] 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 [(1983),] `there is nothing inherently unfair or oppressive about arbitration clauses.' Coleman v. Prudential Bache Securities, Inc., 802 F.2d 1350, 1352 (11th Cir. 1986). . . . Moreover, the Supreme Court has stated: `Mere inequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context.' Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 33, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Instead of suffering unconscionable treatment, a party, `by agreeing to arbitrate, . . . "trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration."' Gilmer, 500 U.S. at 31, 111 S.Ct. 1647 (citations omitted). Thus, agreements to arbitrate are not in themselves unconscionable."
[16] In Fulmer's complaint, the alleged bad acts are repeatedly claimed to have been performed by the "Defendants," not by SCI-Alabama or SCI.
[17] There is also a sentence on an earlier page of the contract that states: "NOTICE: BY SIGNING THIS AGREEMENT, YOU ARE AGREEING TO HAVE ANY AND ALL DISPUTES BETWEEN YOU AND THE SELLER RESOLVED BY ARBITRATION. . . ." (Capitalization original.) However, the terms of the actual arbitration provision supersede this notice.