

# NUMBER 13-16-00699-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

SERVICE CORPORATION INTERNATIONAL
AND SCI TEXAS FUNERAL SERVICES, INC.,
D/B/A BUENA VISTA BURIAL PARK AND
D/B/A FUNERARIA DEL ANGEL BUENA VISTA,                    Appellants,

v.

MARIA RUIZ,                                              Appellee.

On appeal from the 138th District Court
of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Justices Rodriguez, Benavides, and Longoria**
**Memorandum Opinion by Justice Rodriguez**

In this appeal, appellants Service Corporation International and its Texas-based

subsidiary, SCI Texas Funeral Services, Inc. (collectively "SCI") challenge the denial of

its motion to compel arbitration.   By what we treat as five issues, SCI asserts that none

of the grounds raised by appellee Maria Ruiz offer a valid basis to deny arbitration. We reverse and remand.

## I. BACKGROUND

### A. Ruiz's Petition

Mary Ruiz filed this suit against SCI. Ruiz described Service Corporation as a company that operates more than 1,500 funeral homes and 400 cemeteries in 43 states and foreign countries. According to Ruiz's petition, SCI Texas Funeral Services does business in Brownsville as "Funeria Del Angel Buena Vista"[1] (a funeral home) and "Buena Vista Burial Park" (a cemetery). Ruiz alleged that SCI committed fraud in handling the funeral services and burial of Ruiz's deceased brother, Ernesto Eguia.

Ruiz describes the underlying events as follows. After Ernesto's unexpected death, an autopsy was performed by the medical examiner. The medical examiner put Ernesto's organs in a plastic bag and then placed the bag back into the body cavity, stitched up the incision, and released the body to SCI's Buena Vista funeral home. SCI employees embalmed Ernesto's remains. Ruiz asserts that she never consented to the embalming.

While making arrangements for the funeral services, Ruiz toured the mausoleum where the service was to be held, and she noted a "musty smell" and a lack of air-conditioning. She was assured by an SCI employee that these problems would be resolved before the service.

---

[1] Various documents in the record refer to "Funeraria Del Angel Buena Vista" rather than "funeria." A Spanish-to-English dictionary defines "funeraria" as a "funeral parlor." COLLINS COMPLETE SPANISH ELECTRONIC DICTIONARY, "Funeraria" (2017), https://www.collinsdictionary.com/dictionary/spanish-english/funeraria. Our research did not reveal any language which recognizes "funeria" as a word.

On the day of the service, Ruiz arrived at the funeral home early. She and her son approached the casket and found "Ernesto's face, ears and chest . . . covered with what looked like gnats but could have been small flies." During the service, the air-conditioning did not function, and friends and family were forced to "fan[] away the ever-present haze of insects."

Three days after the service, an SCI employee contacted Ruiz to arrange a meeting with SCI's general manager, "Mr. Guerra." At the meeting, Mr. Guerra revealed that, by mistake, the bag containing Ernesto's organs had not been buried with his remains. Mr. Guerra explained that there were two options: (1) disinter Ernesto's remains, place the organs next to Ernesto's body, and re-inter the casket; or (2) cremate the organs and inter them near Ernesto's burial plot.

Ruiz alleges that the actions of SCI's employees constituted fraud by nondisclosure. Ruiz alleged that SCI breached its duty to disclose material facts related to the funeral which were known only to SCI. According to Ruiz, SCI knew and failed to disclose at the time of contracting: that Ernesto's remains were received in a condition that would cause insect infestation, that the remains had suffered a mishap or would be mishandled by SCI in a manner that would cause insect infestation, and that the remains were to be buried without internal organs, among other allegations. Based on these allegations, Ruiz's petition asserts fraud as both a claim for relief and as an affirmative defense to arbitration.

**B.      SCI's Motion to Compel Arbitration and Subsequent Proceedings**

Shortly after receiving Ruiz's petition, SCI filed a motion to compel arbitration and to abate proceedings in the trial court. SCI relied on the arbitration clauses in two

3

contracts between Ruiz and SCI, which we refer to as the Interment Agreement and the Funeral Agreement, or together, the Agreements.

Both Agreements include arbitration provisions in which Ruiz agreed that any claims she had relating to the respective Agreement, including any dispute about the interpretation of its arbitration clause, would be submitted to arbitration under the rules of the American Arbitration Association ("AAA"). The arbitration clauses purported to apply to any claim Ruiz had against "the Seller," any third-party beneficiary to the Agreements, and any companies affiliated with "the Seller," as well as their employees. SCI made no similar promise to arbitrate any claims against Ruiz.

Beyond these arbitration provisions, the Agreements differed in their consideration and terms. Under the Interment Agreement, the primary consideration exchanged was that Ruiz would obtain from SCI the right to inter remains in a plot, and SCI would obtain a total price of $3,279 from Ruiz. Ruiz agreed to many terms favorable to SCI, such as SCI's disclaimer of warranties. For its part, SCI agreed to maintain the funeral grounds and to make deposits into a trust fund for grounds maintenance.

Under the Funeral Agreement, Ruiz was to receive various goods and services from SCI, including embalming the remains, delivering a particular casket, providing funeral services, etc. In exchange, SCI would receive the total price of $5,295.75 from Ruiz. Ruiz further agreed to other provisions favorable to SCI, such as SCI's disclaimer of warranties and consequential damages.

Based on these Agreements and the arbitration clauses they contained, SCI moved to compel arbitration. Ruiz opposed SCI's motion, claiming the Agreements and their arbitration clauses were not enforceable for multiple reasons. First, Ruiz argued

4

that the arbitration provisions were unconscionable. Second, Ruiz cited fraud as an affirmative defense against arbitration. Third, Ruiz asserted that her sole claim for relief—a claim for fraud—fell outside the scope of the arbitration clauses. Fourth, Ruiz argued they were unenforceable because no valid consideration supported the arbitration clauses.

The trial court denied SCI's motion to compel arbitration. In its order, the trial court agreed with and relied upon Ruiz's theory that her fraud claim did not fall within the scope of the arbitration clauses. According to the order, Ruiz's petition alleged "the Defendant's employees knew that the decedent's body was not only not well taken care of but was also buried without the organs," and failed to disclose this fact. Ruiz's claim for fraud "could and should not be contemplated within an agreement to arbitrate." The trial court did not reach the parties' arguments concerning unconscionability, Ruiz's fraud defense against arbitration, or illusory consideration.

SCI filed this interlocutory appeal challenging the denial of its motion to compel arbitration.

## II. STANDARD OF REVIEW

We review an order denying a motion to compel arbitration under an abuse of discretion standard. *In re Labatt Food Serv., LP*, 279 S.W.3d 640, 642–43 (Tex. 2009) (orig. proceeding). Under that standard, we defer to the trial court's factual determinations if they are supported by evidence, but we review the trial court's legal determinations de novo. *Id.* at 643. It is an abuse of discretion for the trial court to rule arbitrarily, unreasonably, without regard to guiding legal principles, or without supporting evidence. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). Whether the parties

5

reached an agreement to arbitrate in the first instance is a question of fact. *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). The question of whether an arbitration agreement is enforceable is subject to de novo review. *Labatt*, 279 S.W.3d at 643.

### III.    FEDERAL ARBITRATION ACT

The trial court's order did not specify whether the arbitration agreements in this case were governed by the Federal Arbitration Act ("FAA") or another body of authority. *See* 9 U.S.C.A. §§ 1–16 (West, Westlaw through P.L. 115-89). As an initial matter, SCI asserts that the Agreements are governed by the FAA, whereas Ruiz asserts that the FAA does not apply.

The FAA applies to arbitration clauses in contracts that affect interstate commerce, and the FAA thus extends as far as the Commerce Clause of the United States Constitution will reach. *Fredericksburg Care Co., LP v. Perez*, 461 S.W.3d 513, 517 (Tex. 2015), *cert. denied sub nom. Perez v. Fredericksburg Care Co., LP*, 136 S.Ct. 798 (2016). Under Commerce Clause jurisprudence, the applicability of the FAA is not limited to transactions that individually have a "substantial effect on interstate commerce." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (per curiam). Rather, the FAA may extend to individual cases without showing any specific effect upon interstate commerce if, in the aggregate, the economic activity in question would represent "a general practice . . . subject to federal control." *Id.* at 56–57.[2]

---

[2] On appeal, Ruiz implies that the Texas Arbitration Act (TAA) governs the Agreements, and she contends that the FAA only applies if the Agreements satisfy a four-part test to determine whether the FAA preempts the TAA, citing *In re D. Wilson Construction Co.* 196 S.W.3d 774, 780 (Tex. 2006) (orig. proceeding). However, as that opinion makes clear, the FAA and TAA are not mutually exclusive, and the "FAA only preempts *contrary* state law, not consonant state law." *Id.* at 779 (emphasis in original). The

6

Multiple aspects of the record confirm that the FAA applies to the Agreements. SCI submitted the affidavit of Abelardo Perez, who attested that SCI Texas Funeral Services, Inc. sold goods to Texas residents, including Ruiz, that were purchased or manufactured out of state. *See id.* at 57 ("[T]he Commerce Clause gives Congress the power to regulate local business establishments purchasing substantial quantities of goods that have moved in interstate commerce . . . ."). Perez further testified that in providing services, SCI Texas Funeral Services relied on goods and materials purchased or manufactured outside of Texas, such as the equipment SCI used to dig graves. *See Serv. Corp. Int'l v. Lopez*, 162 S.W.3d 801, 807 (Tex. App.—Corpus Christi 2005, no pet.) ("A party who alleges interstate commerce may show it in several ways [including] transportation of materials across state lines [and] manufacture of parts in a different state . . . ."); *see also SCI Tex. Funeral Servs., Inc. v. Leal*, No. 13-09-00050-CV, 2009 WL 332043, at *3 (Tex. App.—Corpus Christi Feb. 12, 2009, no pet.) (mem. op.) (per curiam) (combined appeal & orig. proceeding) (relying on SCI's use of "goods purchased or manufactured outside of Texas in its business" to conclude that the FAA governed SCI's arbitration agreement).

In addition, Ruiz's petition alleged that SCI operated more than 1,500 funeral homes and 400 cemeteries in 43 states and foreign countries, and the Funeral Agreement reflects that SCI offered Ruiz the services of a third-party affiliate based outside of Texas. *See Citizens Bank*, 539 U.S. at 57 (finding that loan agreements were governed by the

---

fact that the TAA may apply to the Agreements does not prevent the FAA from applying as well. *Id.* Moreover, Ruiz does not identify any way in which the rules of the FAA would conflict with the TAA, and in her petition, Ruiz expressly denied the applicability of the TAA in the first place. Accordingly, we proceed to determine whether the FAA applies, based on an evaluation of whether the Agreements fall within the reach of the Commerce Clause. *See Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (per curiam).

FAA in part because they supported and implicated the defendant's "business throughout the southeastern United States").

Finally, in aggregate, the provision of funeral goods and services can be said to have a substantial effect on interstate commerce. *See Lopez*, 162 S.W.3d at 807 n.5 (citing *Serv. Corp. Int'l v. Fulmer*, 883 So.2d 621, 629 (Ala. 2003)) ("[T]he provision of funeral goods and services is within Congress's commerce power[.]"); *see also SCI Tex. Funeral Servs., Inc. v. Hijar*, 214 S.W.3d 148, 154 (Tex. App.—El Paso 2007, pet. denied) (op. on reh'g) (discussing the Federal Trade Commission's "Funeral Rule," which, under the aegis of the Commerce Clause and the Federal Trade Commission Act, bars certain unfair practices in the funeral industry).

Because these Agreements and their arbitration provisions bear a sufficient relation to interstate commerce, we conclude that they fall within the reach of the FAA. *See Fredericksburg Care*, 461 S.W.3d at 517.[3]

## IV. WHO DECIDES QUESTIONS OF ARBITRABILITY?

We next address the issue of who should decide questions of arbitrability: the trial court or the arbitrator. By its first issue, SCI asserts that the threshold questions of arbitrability—whether there is a binding arbitration agreement, and whether that agreement encompasses the claim at issue—must be decided by the arbitrator, not the trial court.

A party seeking to compel arbitration under the FAA must establish two threshold questions of arbitrability: (1) that there is a valid arbitration clause, and (2) that the claims

---

[3] A party may bring an interlocutory appeal from an order denying a motion to compel arbitration under the FAA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.016 (West, Westlaw through 2017 1st C.S.).

in dispute fall within that agreement's scope. *In re Rubiola*, 334 S.W.3d 220, 223 (Tex. 2011) (orig. proceeding). These questions of arbitrability must be decided by the courts, unless the parties clearly and unmistakably agreed to submit these questions to the arbitrator. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002); *In re Weekley Homes, LP*, 180 S.W.3d 127, 130 (Tex. 2005) (orig. proceeding).

SCI cites language in both Agreements which, according to SCI, expressly requires the arbitrator to resolve these questions. SCI also points out that both Agreements incorporate the arbitration rules of the AAA. SCI directs our attention to multiple cases—including cases from this Court—holding that the incorporation of the AAA rules may serve as "clear and unmistakable" evidence of the parties' agreement to delegate questions of arbitrability to an arbitrator. *See Saxa Inc. v. DFD Architecture Inc.*, 312 S.W.3d 224, 230 (Tex. App.—Dallas 2010, pet. denied); *see also In re Rio Grande Xarin II, Ltd.*, No. 13-10-00115-CV, 2010 WL 2697145, at *8 (Tex. App.—Corpus Christi July 6, 2010, pet. dism'd) (mem. op.) (combined appeal & orig. proceeding).

However, our review of the record reveals that SCI did not raise this argument before the trial court. Instead, SCI invited the trial court to decide all questions of arbitrability. Accordingly, SCI has not preserved this argument for appellate review. *See* TEX. R. APP. P. 33.1(a); *Henry & Sons Constr. Co., Inc. v. Campos*, 510 S.W.3d 689, 699 & n.5 (Tex. App.—Corpus Christi 2016, pet. denied); *Nw. Constr. Co. v. Oak Partners, LP*, 248 S.W.3d 837, 846–47 (Tex. App.—Fort Worth 2008, pet. denied) (combined appeal & orig. proceeding). We overrule SCI's first issue.

## V. VALIDITY OF THE AGREEMENTS AND THEIR ARBITRATION CLAUSES

9

By its second issue, SCI contends that both Agreements and their arbitration clauses are valid and binding on both parties. In that connection, SCI asserts that the arbitration clauses and Agreements are supported by valid consideration. SCI challenges this Court's opinion in *SCI Texas Funeral Services, Inc. v. Leal*, which Ruiz has cited in support of her argument that no valid consideration supports the Agreements. *See* 2009 WL 332043, at *6. In *Leal*, we found a similar arbitration agreement between SCI and a bereaved plaintiff to be supported only by illusory consideration on SCI's part and therefore unenforceable. *See id.* at *5–6. SCI asserts that *Leal* is distinguishable on its facts and was wrongly decided. We agree that *Leal* is distinguishable. Also in this section, we address two of Ruiz's other counterarguments to the validity of the Agreements.

## A.    Applicable Law

Again, a party seeking to compel arbitration must establish the existence of a valid arbitration agreement between the parties. *In re Odyssey Healthcare, Inc.*, 310 S.W.3d 419, 422 (Tex. 2010) (per curiam) (orig. proceeding). Under the FAA, ordinary principles of state contract law determine whether there is a valid agreement to arbitrate. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005) (orig. proceeding).

Like other contracts, arbitration agreements must be supported by the exchange of consideration. *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676 (Tex. 2006) (orig. proceeding). Consideration is a bargained for exchange of promises or performance between the parties. *See ULICO Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 790 (Tex. 2008). Consideration is composed of benefits and detriments to the contracting parties. *Id.* When the consideration consists of mutual promises between the parties,

10

the agreement is a "bilateral contract"—one in which there are mutual promises between two parties to the contract, each party being both a promisor and a promisee. *Vanegas v. Am. Energy Servs.*, 302 S.W.3d 299, 302 (Tex. 2009).

"When illusory promises are all that support a purported bilateral contract, there is no contract." *Id.* at 301. Promises are illusory and unenforceable if they fail to bind the promisor, who retains the option of discontinuing performance. *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 505 (Tex. 2015) (combined appeal & orig. proceeding); *see Vanegas*, 302 S.W.3d at 301. Generally, if a party has the unlimited right to terminate an agreement and avoid its promised obligation without prior notice, the agreement is based upon an illusory promise and is unenforceable due to its lack of mutual consideration. *Weekley Homes, LP v. Rao*, 336 S.W.3d 413, 419 (Tex. App.—Dallas 2011, pet. denied); *see Henry & Sons*, 510 S.W.3d at 693.

Where an arbitration agreement stands alone and is based solely on the parties' mutual promise to arbitrate disputes, the agreement is illusory if it binds one party to arbitrate, while allowing the other to choose whether to arbitrate. *Royston, Rayzor*, 467 S.W.3d at 505. But when an arbitration provision is part of a larger, underlying contract, the consideration supporting the underlying contract may also support the arbitration clause. *Id.*

## B. Discussion

Here, neither arbitration clause shows a mutual promise to arbitrate disputes. In each Agreement, Ruiz promised to arbitrate disputes against SCI and its affiliates, but SCI offered no similar promise in return. *See id.*

However, the arbitration clauses in question are not stand-alone agreements; they are part of larger, underlying contracts: the Interment Agreement and the Funeral Agreement. *See id.* Therefore, if there is valid consideration to support these underlying Agreements, that consideration may also support Ruiz's obligation to arbitrate disputes against SCI. *See id.*

We find that the Interment Agreement and its arbitration clause are supported by valid consideration in the form of mutual, binding promises. Ruiz agreed to several benefits in favor of SCI and detriments to herself, including a promise to pay SCI $3,279, a generous liquidated damages clause in the event of her breach, a limitation on her ability to assign the contract, and a promise to arbitrate any claims she may have relating to the Interment Agreement. In return, SCI promised certain benefits to Ruiz and detriments to itself: to grant her permanent interment rights and to maintain the cemetery grounds in perpetuity, among others. Neither party had an unchecked means of avoiding these promises.[4] These binding promises support the Interment Agreement as a whole and the arbitration provision it contained. *See id.*

Similarly, under the Funeral Agreement, Ruiz was to receive various goods and services from SCI—embalming, a casket, funeral services—and SCI would receive the total price of $5,295.75 from Ruiz. Ruiz agreed to other provisions favorable to SCI, but

---

[4] The only means of cancellation discussed in the Interment Agreement was SCI's right to cancel the Agreement in the event of a material breach by Ruiz. This provision does not give SCI an unlimited right to avoid fulfilling its promises, so as to render any promises illusory. Rather, this provision does little more than memorialize SCI's right under the common law to discontinue performance after the other party's breach. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.").

12

none of those provisions offered SCI the unfettered right to avoid performance of its promises. *See id.*

The Agreements are distinguishable from the contract at issue in *Leal*, which gave SCI the

> right at any time it finds itself unable to fulfill this Agreement or perform any service or make any interment because of . . . any other unforeseen contingency . . . or because of any mistake or error in description, location, or availability of property . . . to return to the Purchaser all moneys paid hereunder for the items affected by such and this Agreement shall as to such affected items become null and void.

2009 WL 332043, at *6. In *Leal*, we relied, in part, on SCI's unbridled discretion to cancel the contract due to any "unforeseen contingency" or "mistake" in holding that consideration for the contract was illusory. *See id.* The Agreements here give SCI no similar discretion. Therefore, the Agreements and their arbitration provisions are supported by valid consideration. *See Royston, Rayzor*, 467 S.W.3d at 505.

## C. Ruiz's Other Arguments Against the Validity of the Agreements

Ruiz raises other arguments against the validity of these Agreements. First, Ruiz objects to Perez's affidavit, which was introduced to authenticate the Agreements as evidence. In his affidavit, Perez identified himself as the market manager of SCI Texas Funeral Services, set out his general qualifications as an affiant, and averred that he had personal knowledge of all facts stated therein, which he swore to be true. Perez also asserted that the attached Exhibit A contained true and correct copies of the Interment Agreement and the Funeral Agreement. A properly sworn affidavit stating that the attached documents are true and correct copies of the original will authenticate the copies so they may be considered as evidence. *In Estate of Guerrero*, 465 S.W.3d 693, 704

13

(Tex. App.—Houston [14th Dist.] 2015, pet. denied) (en banc). Perez's affidavit provides a basis "to support a finding that the item is what the proponent claims it is," for purposes of the motion to compel arbitration. *See* TEX. R. EVID. 901(a). We find no material infirmity in his affidavit that would prevent the trial court from considering it or the Agreements it sought to authenticate.

Next, Ruiz objects that SCI did not demonstrate that the Funeral Agreement creates a valid arbitration agreement with regard to SCI; Ruiz notes that by its terms, the Funeral Agreement is a contract between Ruiz and "Funeraria Del Angel Buena Vista," and that the arbitration provision simply states that Ruiz agreed to arbitrate disputes against "the Seller." The Funeral Agreement never expressly mentions the companies we refer to as SCI—Service Corporation International and SCI Texas Funeral Services— which are the defendants in this suit. Ruiz asserts that there is no valid evidence that SCI Texas Funeral Services is the same party as Funeraria Del Angel Buena Vista, and therefore, even if she agreed to arbitrate disputes against Funeraria Del Angel Buena Vista, she is not obligated to arbitrate her claims against either Service Corporation International or SCI Texas Funeral Services. We disagree.

In Perez's affidavit, he averred that SCI Texas Funeral Services does business in Texas as Funeraria Del Angel Buena Vista, and that the Funeral Agreement was in fact a contract between Ruiz and SCI Texas Funeral Services. Ruiz made similar allegations in her own live petition, in which she described one defendant as SCI Texas Funeral Services "doing business as Funeria [sic] Del Angel Buena Vista and Buena Vista Burial Park in Brownsville, Texas," which is an apparent misnomer for Funeraria Del Angel Buena Vista. Both of these facts suggest that SCI Texas Funeral Services is the same

14

party as Funeraria Del Angel Buena Vista, and because Ruiz agreed to arbitrate claims against Funeraria Del Angel Buena Vista, she necessarily agreed to arbitrate claims against SCI Texas Funeral Services. *See Brown v. Lanier Worldwide, Inc.*, 124 S.W.3d 883, 896 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (relying on similar evidence to uphold the enforceability of an arbitration provision); *see also Raya v. Rio Mgmt. Co., LLC*, No. 13-13-00711-CV, 2015 WL 4504696, at *3–4 (Tex. App.—Corpus Christi July 23, 2015, no pet.) (mem. op.) (affirming an arbitral award despite the misnomer of a party to the arbitration agreement).

Moreover, Ruiz further described Service Corporation International as the parent company of SCI Texas Funeral Services. Under the terms of the arbitration clause in the Funeral Agreement, Ruiz expressly agreed to arbitrate disputes against Funeraria Del Angel Buena Vista as well as any of its "parent, subsidiary, or affiliate corporations." Because SCI Texas Funeral Services had a right to enforce the arbitration clause, its "parent" company Service Corporation International did as well. *See In re Kaplan Higher Educ. Corp.*, 235 S.W.3d 206, 210 (Tex. 2007) (per curiam) (holding that "arbitration agreements are enforced according to their terms," in deciding that a non-signatory parent company could enforce an arbitration agreement between its subsidiary and the plaintiff).

Under the abuse of discretion standard, these aspects of the record would provide a sufficient basis for the trial court to conclude that Ruiz agreed to arbitrate any claims relating to the Funeral Agreement against both of the SCI defendants in this case. *See Labatt*, 279 S.W.3d at 642–43.

**D. Summary**

Having rejected Ruiz's counterarguments and having found the Agreements to be supported by valid consideration, we conclude that the Agreements and their arbitration clauses are valid and binding. *See ULICO Cas.*, 262 S.W.3d at 790. SCI has therefore satisfied half of its initial burden: to demonstrate the existence of a valid arbitration clause. *See Rubiola*, 334 S.W.3d at 223. We sustain SCI's second issue.

## VI. THE SCOPE OF THE ARBITRATION CLAUSES

By what we construe as its third issue, SCI asserts that it has demonstrated the other half of its initial burden under the FAA: to show that the claim in dispute falls within the scope of the arbitration agreements. *See id.* In that regard, SCI disputes Ruiz's argument that her fraud claim could not have been subject to an arbitration agreement. The trial court apparently agreed with Ruiz and found that her allegations of fraud, by their very nature, "could and should not be contemplated within an agreement to arbitrate."

Ruiz's argument was rejected by the United States Supreme Court in 1967:

> In the present case no claim has been advanced by Prima Paint that F & C fraudulently induced it to enter into the agreement to arbitrate any controversy or claim arising out of or relating to this Agreement, or the breach thereof. This contractual language is easily broad enough to encompass Prima Paint's claim that both execution and acceleration of the consulting agreement itself were procured by fraud. Indeed, no claim is made that Prima Paint ever intended that legal issues relating to the contract be excluded from arbitration, or that it was not entirely free so to contract.

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406 (1967) (internal quotations and editorial marks omitted).

Similar to the arbitration clause in *Prima Paint*, Ruiz stipulated in both Agreements that "any claim he/she may have relating to the transaction contemplated by this agreement (including any claim or controversy regarding the interpretation of this

16

arbitration clause) shall be submitted to and resolved by mandatory and binding arbitration in accordance with applicable rules of the American Arbitration Association ('AAA') . . . ." *See id.*

Just as the Supreme Court decided in *Prima Paint*, we determine that Ruiz's fraud claim falls within the ambit of "any claim relating to the transaction contemplated by this agreement." *See id.* Ruiz's only basis for involvement with SCI was Ernesto's funeral and interment, which was the sole subject of the Agreements. Moreover, each fraud allegation in Ruiz's petition refers, in some way, to the contract. Many allegations begin with a phrase such as "at the time of entering into its contract with Plaintiff," and the allegations describe SCI's breach of a duty to disclose material facts to Ruiz—a duty that, Ruiz reasoned, was created by the Agreements. We therefore conclude that SCI has satisfied the other half of its initial burden: to demonstrate that the claim in dispute falls within the scope of the Agreements' arbitration clauses. *See Rubiola*, 334 S.W.3d at 223. We sustain SCI's third issue.

### VII. RUIZ'S CLAIM OF FRAUD AS A DEFENSE TO ARBITRATION

We have determined that Ruiz's claim for fraud fell within the scope of the arbitration clause, satisfying SCI's initial burden. *See id.* We next address Ruiz's use of fraud as a defense to arbitration, which is part of Ruiz's responsive burden. *See Odyssey Healthcare*, 310 S.W.3d at 422. By what we construe as its fourth issue, SCI asserts that Ruiz's fraud defense does not justify the denial of arbitration. We agree.

Once the party seeking arbitration has satisfied its initial burden, it becomes the burden of the party resisting arbitration to prove its defenses against enforcing an otherwise valid arbitration provision. *Id.* Generally applicable contract defenses, such

as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening the FAA. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). However, these defenses must specifically relate to the arbitration provision itself, not the contract as a whole, if they are to defeat arbitration. *Lopez*, 162 S.W.3d at 809. If a fraudulent-inducement claim attacks the broader contract, then the arbitrator, not a court, considers the matter. *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 & n.13 (Tex. 2008).

In her petition, Ruiz made multiple allegations of fraud against SCI that relate to the Agreements as a whole—for instance, that SCI knew and failed to disclose at the time of contracting that Ernesto's remains were received in a condition that would cause insect infestation, in violation of its duty to disclose. None of the allegations in Ruiz's petition imply that SCI fraudulently induced her to agree to arbitrate her claim. Furthermore, when Ruiz amended her petition, Ruiz attached an affidavit in which she averred that when she made funeral arrangements with SCI's employees, "[a]t no time was arbitration discussed."[5]

Ruiz's fraud allegations relate to the Agreements as a whole, and not to the arbitration clause in particular. *See id.* Therefore, if Ruiz's affirmative defense of fraud is to be addressed, it is the arbitrator, and not the trial court, that must address it. *See id.* The trial court could not have relied on Ruiz's affirmative defense of fraud to deny arbitration. We sustain SCI's fourth issue.

### VIII. UNCONSCIONABILITY

---

[5] Ruiz does not contend that SCI had a duty to disclose the arbitration provisions or that she lacked an opportunity to discover these provisions.

Finally, in what we construe as its fifth issue, SCI challenges Ruiz's last remaining ground for resisting arbitration: the defense of unconscionability. Unlike Ruiz's fraud defense to arbitration, Ruiz's unconscionability argument plainly relates to the arbitration provisions themselves. *See id.* This defense therefore could have been validly addressed by the trial court. *See id.* However, the trial court did not set out in its order that it reached this ground denying SCI's motion to compel arbitration.

In reviewing arbitration orders, we have held that appellate courts have discretion to consider alternative grounds to affirm the order when those grounds were presented to the trial court but not ruled upon, when the parties raise them for review, and when the record is well developed with regard to those grounds. *In re Brock Specialty Servs., Ltd.*, 286 S.W.3d 649, 656–57 (Tex. App.—Corpus Christi 2009, orig. proceeding). When the record is not fully developed with respect to the alternative grounds, appellate courts should refrain from addressing issues beyond the trial court's express basis for its ruling. *Id.* at 657.

In this case, the trial court did not reach the merits of Ruiz's unconscionability defense, and the undeveloped record does not permit us to reach the merits of that defense. Accordingly, we decline to address the merits of that defense, and we leave this issue for the trial court's resolution. *See id.*

## IX. CONCLUSION

We have sustained SCI's issues relating to whether consideration was sufficient and whether the instant claim fell within the scope of the Agreements' arbitration provisions. We have also sustained SCI's challenge to Ruiz's affirmative defense of fraud. Accordingly, we reverse the trial court's order and remand the matter to the trial

19

court for further proceedings consistent with this opinion, including the resolution of Ruiz's unconscionability defense.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the
25th day of January, 2018.